UNITED STATES of America, Appellee,

v.

Gerald Harvey **GREENFIELD**, also known as David F. Mills, also known as John Hill, also known as Tom Branch and Charles Raymond Lyons, Defendants–Appellants.

Nos. 154, 126 and 203, Dockets 94–1001, 94–1033 and 94–1086.

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1994.

Decided Jan. 13, 1995.

Michael O. Sheehan, Asst. Federal Public Defender, New Haven, CT (Thomas G. Dennis, Federal Public Defender on the brief), for defendant-appellant Gerald Harvey Greenfield.

Martin G. Fogelson, New York City for defendant-appellant Charles Raymond Lyons.

Robert S. Apter, Asst. U.S. Atty., New Haven, CT (Christopher F. Droney, U.S. Atty., New Haven, CT), for appellee.

Before: NEWMAN, Chief Judge, WALKER, CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

The ingenuity and assiduousness of humans know few bounds. Unfortunately, all too often, they are used in schemes to steal and cheat. This case involves just such schemes.

Gerald H. Greenfield and Charles R. Lyons appeal sentences imposed by the United States District Court for the District of Connecticut (Alfred V. Covello, Judge) following their guilty pleas to bank-fraud related offenses. Greenfield and Lyons contest the calculation of their sentences on various grounds: Greenfield disputes the District Court's determination of his offense level under the Sentencing Guidelines and the Court's decision to depart upward from the Guidelines. Lyons disputes the losses that the District Court held were properly attributable to him. For the reasons that follow, we remand the sentences of both Greenfield and Lyons for further findings.

## BACKGROUND

In early 1992, Greenfield and a long-time friend, Alan Scott Pace, joined in a scheme to obtain and use American Express credit cards fraudulently. Employing fictitious corporate and individual identities in various cities, Greenfield and Pace obtained many American Express cards and then used brokerage accounts at several Shearson Lehman Brothers offices in order to maximize the spending limits on these credit cards.

Greenfield and Pace bought expensive jewelry and secured cash advances with the American Express cards. When they reached the spending limits on particular cards, Greenfield and Pace wrote bad checks to cover the balances, which allowed them to keep using the cards until the checks bounced. From February to November of 1992, the American Express Travel Related Services Company sustained losses of $356,611 as the result of this scheme.[1]

In early 1993, Greenfield and Pace embarked upon another scam. Conducting business as Guarantee Trust Leasing, they fraudulently got hold of equipment that enabled them to build a phony Automated Teller Machine ("ATM"). This machine was able to record the bank account numbers and personal identification numbers ("PINs") of those who sought to use it. Greenfield and Pace also fraudulently obtained the equipment needed to encode bank account numbers and PINs onto blank plastic cards. The total value of the equipment acquired by Greenfield and Pace exceeded $100,000. The conspirators never paid for any of this equipment.

Using corporate and personal aliases, Greenfield and Pace then arranged for the phony ATM to be put in the Buckland Hills Mall in Manchester, Connecticut. Assisted by Pace and the newly-recruited Charles Lyons, Greenfield took the phony ATM to the Buckland Mall and installed it there in late April of 1993. From April 27 to May 9, the phony ATM, which was not linked to any banking network, recorded the bank account numbers and PINs of Buckland Mall customers who tried to use it. On May 8, Lyons furthered the scheme by placing a glue-covered card in the Buckland Mall's one legitimate ATM. This broke the valid ATM and led more people to use the phony ATM. On May 9, 1993, Greenfield, Pace, and Lyons removed the phony ATM from the Buckland Mall and stored it in Stamford, Connecticut.

Greenfield and Pace used the information received from the phony ATM to manufacture hundreds of counterfeit ATM cards. Along with Lyons, they used these counterfeit ATM cards in the period from April 27 to May 18 to withdraw over $107,000 in cash from legitimate ATMs in four states.

In June of 1993, the ATM scam was uncovered and Pace was arrested. Greenfield surrendered to authorities soon after Pace's arrest, and Lyons was arrested a month later. All three defendants were charged on an indictment containing many bank-fraud related counts. Greenfield ultimately pleaded guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344, and to one count of producing counterfeit ATM cards, in violation of 18 U.S.C. § 1029(a)(1).[2] Lyons admitted that he conspired with Greenfield and Pace to utilize counterfeit access devices, to transport a stolen ATM machine, and to commit bank fraud, and he pleaded guilty to one conspiracy count that included these terms.

*Greenfield's Sentence* —The Presentence Report ("PSR") for Greenfield calculated his final offense level at 17 under the Sentencing Guidelines. The PSR suggested a base level of six, *see* U.S.S.G. § 2F1.1(a), and a ten-level upward adjustment because the total loss occasioned by Greenfield's two schemes exceeded $500,000, *see id.* § 2F1.1(b)(1)(K). The PSR also recommended a two-level increase because the offense involved more than minimal planning and resulted in losses to numerous victims, *see id.* § 2F1.1(b)(2), and a two-level increase since Greenfield was an "organizer" of criminal activity involving less than five participants, *see id.* § 3B1.1(c). The PSR also suggested a three-level decrease for acceptance of responsibility, *see id.* § 3E1.1. Finally, the PSR noted that, according to the Application Notes of § 2F1.1, an upward departure was perhaps warranted because of Greenfield's possession of "access devices."

Despite Greenfield's objections, the District Court followed the PSR's suggestions. Specifically, the Court accepted the PSR's offense level of 17 and then upwardly departed two levels relying on Application Note 11

---

**1.** For this plot, Greenfield and Pace were charged in the Eastern District of Virginia. The case was transferred to the District of Connecticut pursuant to Fed.R.Crim.P. 20.

**2.** Pace pleaded guilty to similar offenses, but his conviction and sentence are not before us.

of § 2F1.1. The offense level now being 19, the District Court imposed 30 months' imprisonment to be followed by four years of supervised release. The Court also ordered Greenfield to make restitution to his victims.

*Lyons's Sentencing*—Lyons's PSR calculated a final offense level of 12 under the Guidelines. The PSR recommended a base level of six, *see* U.S.S.G. § 2F1.1(a), and an eight-level upward adjustment because the loss occasioned by the ATM scheme—the $107,460 withdrawn with the counterfeit ATM cards and the $100,000 of fraudulently-obtained equipment—exceeded $200,000, *see id.* § 2F1.1(b)(1)(I). The PSR also urged a two-level increase because the offense involved more than minimal planning, *see id.* § 2F1.1(b)(2), and two two-level decreases as a result of Lyons's minor role, *see id.* § 3B1.2(b), and his acceptance of responsibility, *see id.* § 3E1.1(a).

Just before sentencing, Lyons claimed, for the first time, that he had withdrawn from the ATM conspiracy on May 14, 1993, as soon as he learned that the suppliers of the equipment used in the ATM scheme had not been paid. Lyons argued that he should not be held accountable for the losses occasioned by the ATM scheme after May 14, and for the value of the fraudulently-obtained equipment used in the scheme.

At sentencing, the District Court was informed of Lyons's claim that, in the course of a meeting on May 14, he clearly and unequivocally said to Pace that he no longer wanted to be part of the conspiracy. The District Court stated that, even if it accepted Lyons's account as true, his "acts would not be sufficient to withdraw from the conspiracy." Sentencing Transcript at 25, *United States v. Lyons*, No. 3–93–cr–146 (D.Conn. Dec. 17, 1993). As a result, the Court held Lyons accountable for the entire loss occasioned by the ATM scam. The District Court also apparently agreed with the PSR's Guidelines calculations and found an offense level of 12. It accordingly imposed a sentence of five months' imprisonment, five months of home detention, and three years of supervised release.

## DISCUSSION

Greenfield and Lyons each lodge two complaints with respect to the District Court's sentencing calculations. Greenfield asserts error in the imposition of a two-level increase for his role as an "organizer" in the offense and in the decision to depart upward from his computed Guideline range. Lyons claims the District Court erred in holding him responsible for the value of the equipment fraudulently obtained by his co-conspirators, and in rejecting, as a matter of law, his purported withdrawal from the conspiracy.

Though we reject Greenfield's argument concerning the District Court's decision to depart upward, we find that his other contention reveals a key factual uncertainty with respect to his role as an "organizer" in the offense, an uncertainty that the sentencing court must address on remand before the propriety of the two-level enhancement for being an "organizer" can be resolved. Furthermore, as the Government concedes, both of Lyons's assertions expose defects in the District Court's determinations that require us to remand his sentence for further factual determinations.

### I. Greenfield's Complaints

#### A. Enhancement for Role as an "Organizer"

Protesting his adjustment under § 3B1.1(c)—which provides for a two-level increase if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity" that involved less than five participants and was not otherwise extensive, U.S.S.G. § 3B1.1(c)—Greenfield first asserts that his enhancement cannot be based on his relationship to Pace because he and Pace had equal roles in the offense. They planned and executed the ATM and American Express schemes together—as full and equal partners. Greenfield then claims his enhancement cannot be based on Lyons's involvement because he did not directly recruit or control Lyons. Lyons, he asserts, was recruited and supervised only by Pace.

Because the Government has conceded that Greenfield did not directly control or supervise Lyons and the record demon-

strates that Greenfield and Pace were indeed equal partners, Greenfield's contentions with respect to his two-level enhancement under § 3B1.1(c) have a measure of merit. The adjustment would have been inapplicable were Greenfield and Pace, as equal partners, the only participants in their schemes. *See* U.S.S.G. § 3B1.4, comment. (explaining that no role adjustment is to be given when the offense is committed "by individuals of roughly equal culpability"); *see also United States v. Katora*, 981 F.2d 1398, 1402–03 (3d Cir.1992) (finding § 3B1.1 enhancement inapplicable when two participants "bear equal responsibility for 'organizing' their own commission of a crime").

■ Moreover, an increase under § 3B1.1(c) could not be based solely upon Greenfield's extensive planning and preparations in connection with the schemes. To do so would involve impermissible "double-counting" in light of the fact that Greenfield had already been assessed an enhancement under § 2F1.1(b)(2), which applies to criminal conduct involving more than minimal planning.[3] Nor could a § 3B1.1(c) enhancement be premised upon Greenfield's management of property, assets, and activities in the schemes. The current version of Application Note 2 of § 3B1.1 explains that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, comment. (n.2). It also indicates that an "upward *departure* may be warranted ... in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." *Id.* (emphasis added). Thus, by negative implication, the Application Note seems clearly to preclude management responsibility over

property, assets, or activities as the basis for an *enhancement* under § 3B1.1(c).

■ It is only through the involvement of a further participant—in this instance Lyons—that the District Court's application of § 3B1.1(c) to Greenfield can be justified. Indeed, as we recently explained in *United States v. Leonard*, 37 F.3d 32 (2d Cir.1994):

> To qualify for an adjustment under § 3B1.1, the defendant must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.

*Id.* at 38 (citations and quotations omitted). As noted before, the Government conceded to the District Court that "Greenfield did not exercise control over or supervise either defendants Pace or Lyons," Sentencing Transcript at 28, *United States v. Greenfield*, No. 3–93–cr–146 (D.Conn. Dec. 20, 1993) [hereinafter Greenfield's Sentencing Transcript]. It follows that an adjustment for Greenfield can stand only if he was "responsible for *organizing* [Lyons] for the purpose of carrying out the crime." *Leonard*, 37 F.3d at 38 (emphasis added).

■ Evidence of a defendant's direct and immediate control over other participants obviously provides the strongest support for any aggravating role enhancement. *See, e.g., United States v. Liebman*, 40 F.3d 544, 548 (2d Cir.1994). Yet, as the *Leonard* case suggests, direct and immediate control over other participants, though a crucial and perhaps even the most important factor, is neither a strict prerequisite for an enhancement under § 3B1.1(c) nor the only factor a court should consider. *See United States v. Vargas*, 16 F.3d 155, 160 (7th Cir.1994); *cf.* U.S.S.G. § 3B1.1, comment. (n.4) (specifying seven factors, of which only one concerns "the degree of control and authority exer-

---

**3.** The application of enhancements both for a defendant's leadership role under § 3B1.1 and for more than minimal planning under § 2F1.1(b)(2) does not necessarily amount to impermissible double-counting. *See United States v. Rappaport*, 999 F.2d 57, 60–61 (2d Cir.1993) (noting that "leading and planning are disparate aspects of criminal conduct" and thus these provisions do "not necessarily reflect the same facet

of [the defendant's] conduct"). Nevertheless, a sentencing court cannot, in addition to an increase for "more than minimal planning," apply a role-in-the-offense enhancement premised *solely* upon the extensiveness of the defendant's preparations and planning. By doing so, the sentencing court would be impermissibly relying upon the same facet of the defendant's conduct to justify two enhancements. *See id.*

cised over others," that a court is to consider when assessing whether a defendant occupies a position of leader/organizer or manager/supervisor). To hold that direct and immediate control over other participants is a strict prerequisite to a § 3B1.1 enhancement would improperly permit exceedingly culpable defendants—*i.e.*, persons placed high in a criminal organization's chain of command—to insulate themselves from enhancements under § 3B1.1 by entrusting the recruitment and supervision of subordinates to their partners/co-conspirators.

 But to be found "responsible for organizing others," and thereby subject to a § 3B1.1 enhancement, a defendant must have at least played a significant role in the decision to recruit or to supervise lower-level participants. *See Katora*, 981 F.2d at 1403 (noting that enhancement under § 3B1.1 would "be appropriate if [equal partners] had organized a third person"). In this case, if Greenfield was substantially involved in Pace's decisions concerning the recruitment and supervision of Lyons, an enhancement under § 3B1.1 would clearly be proper. If not, such an enhancement would not be appropriate—for example, if Greenfield had expressed little interest in having others participate and passively acquiesced in Pace's enlistment and management of Lyons.

Unfortunately, the evidence developed below is quite vague about the role Greenfield played in Lyons's recruitment and supervision. It seems clear that it was Pace who *directly* enlisted, controlled, and managed Lyons. However, Lyons's participation in the ATM scheme—*i.e.*, helping Greenfield install and remove the phony ATM from the Buckland Mall and placing a glue-covered card in the legitimate ATM—does indicate that Greenfield was fully aware of Lyons's involvement and directly profited from

Lyons's activities. Is there, then, an adequate foundation for an enhancement? Without more we cannot say. Because the District Court failed to make specific factual findings (based on the record before it or after additional evidentiary hearings) when it applied § 3B1.1, we cannot assess Greenfield's *responsibility* for Lyons's involvement.[4] We simply cannot tell whether, for example, Greenfield talked to Pace about the involvement and supervision of an additional participant and thus was aware of (or could have readily foreseen) Pace's enlistment and management of Lyons. For it is also possible that Pace recruited and controlled Lyons on his own and without consulting or involving Greenfield.

Without more developed factual findings by the District Court, we cannot determine whether the enhancement for Greenfield's offense role was proper. Consequently, we must remand this portion of Greenfield's sentence for additional findings as to whether Greenfield was "responsible for organizing [Lyons] for the purpose of carrying out the crime."

### B. Upward Departure

 The District Court decided to depart upward two levels from Greenfield's computed Guideline offense level. It did so on the basis of Application Note 11 of the relevant Fraud Guideline, which states that in "an offense involving ... access devices, an upward departure may be warranted where the actual loss does not adequately reflect the seriousness of the conduct." U.S.S.G. § 2F1.1, comment. (n.11).[5] In support of this decision, the Court explained that the possession of the means for manufacturing phony ATM cards "leaves the opportunity for a much greater loss than that which occurred,"

---

4. We have repeatedly stressed that a sentencing court must make specific factual findings in support of any offense-role enhancement. This case demonstrates why such findings are crucial for adequate appellate review. *See United States v. Liebman*, 40 F.3d 544, 548 (2d Cir.1994); *United States v. Fermin*, 32 F.3d 674, 682 (2d Cir.1994); *United States v. Stevens*, 985 F.2d 1175, 1184–85 (2d Cir.1993); *United States v. Lanese*, 890 F.2d 1284, 1294 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990).

5. Application Note 11 was amended after Greenfield's offenses but before his sentencing. *See* U.S.S.G. App. C, Amendment 482. The Sentencing Commission described this amendment as a clarification, and Greenfield has not suggested that the pre-amendment version is applicable. We therefore address Greenfield's challenge in terms of the revised version of Application Note 11.

and therefore "the actual loss [in this case] simply does not adequately reflect the seriousness of the conduct." Greenfield's Sentencing Transcript at 49.

Greenfield claims the District Court lacked authority to depart upward because, he asserts, there is no basis for concluding that the loss here did not "adequately reflect the seriousness" of his conduct. Greenfield points out that the facts of this case do not present any of the situations described in one part of the Guidelines commentary as instances in which the actual loss does not capture the seriousness of the conduct, *see* U.S.S.G. § 2F1.1, comment. (n.10). Greenfield also contends that the calculation of his offense level, without an upward departure, fully reflects all aspects of his criminal behavior: the actual loss was measurable and the amount of the loss was the cause of a ten-level enhancement, and the extensiveness of the offense was reflected in an enhancement for more than minimal planning. Greenfield finally argues that even if the facts could justify a departure, the District Court's findings are too cursory to support the departure decision and a remand for a more detailed statement is required.

We disagree. Application Note 11 of § 2F1.1 emphasizes that an offense involving access devices may warrant an upward departure because the Sentencing Commission believed such offenses often would involve conduct more serious than reflected in the actual loss. Such offenses will frequently be more serious than indicated by the actual loss, not because they happen to fit the specific examples detailed in Application Note 10, but because they involve a risk of loss that is much greater than the actual loss. Offenses involving access devices create an extraordinary potential for enormous losses, and this in itself may well warrant an upward departure beyond the offense level established by the actual loss.

This case is an obvious example. Greenfield's production and possession of counterfeit ATM cards created a risk of loss far greater than the actual loss caused by the ATM scheme. The defendants used the ATM cards to withdraw only a little more than $100,000. But the cards they made would have allowed them (or any others who got hold of the cards) to withdraw much larger sums. Moreover, as stressed by the District Court, Greenfield not only manufactured and possessed numerous access devices, he also had the equipment that could produce many more such devices. This enhanced still further the potential for extraordinary and extensive losses from the scheme. We do not doubt that, as the District Court said, Greenfield's possession of counterfeit ATM cards and the equipment needed to produce such cards created "the opportunity for a much greater loss than that which occurred." And we conclude that the upward departure recommendation in Application Note 11 of § 2F1.1 for offenses involving "access devices" was directed toward cases of this sort.

 The District Court's findings in support of its decision to depart upward, if somewhat brusque, were adequate. The Court's discussion of Greenfield's offense emphasized the precise principle that justifies an upward departure in this context: "the opportunity for a much greater loss than that which occurred." The primary authority that Greenfield cites for greater specificity, *United States v. Ogbeide,* 911 F.2d 793 (D.C.Cir.1990), is readily distinguishable. In *Ogbeide,* the District of Columbia Circuit remanded for further findings when a sentencing court sought to justify an upward departure by paraphrasing the introductory language of the applicable Application Note. *See id.* at 795. The sentencing court in *Ogbeide,* however, gave no explanation of how the facts before it fit the language of the Application Note. Here the District Court provided just that kind of explanation. Further, in *Ogbeide* the departure was based on current Application Note 10, which lists examples, but states no underlying basis for a departure. Here Application Note 11 was relied on and, as we have noted, Note 11 indicates a very particular basis for a departure, a basis that the District Court explicitly found was reflected in the facts of this case. *Cf. United States v. Root,* 12 F.3d 1116, 1121 (D.C.Cir.1994) (distinguishing *Ogbeide* on similar grounds).

The District Court had an adequate basis for its upward departure and made adequate findings in support of its decision. We, therefore, affirm this aspect of Greenfield's sentence.

## II. Lyons's Complaints

Lyons asserts that the District Court miscalculated the loss attributable to him. At sentencing, the Court ascribed to Lyons the entire loss occasioned by the ATM scheme— the $107,460 withdrawn with counterfeit ATM cards and the $100,000 of equipment fraudulently obtained by Pace and Greenfield to facilitate the scheme. This resulted in an eight-level enhancement under § 2F1.1(b)(1)(I). Lyons argues that he should not be held accountable either (1) for the value of the fraudulently-obtained equipment, or (2) for the amount of money obtained with the counterfeit ATM cards after his claimed withdrawal from the conspiracy. On both these points, the Government concedes that Lyons's sentence cannot stand. We agree and remand for additional findings.

### A. Loss to Equipment Suppliers

■ Section 1B1.3(a) provides that a defendant convicted for participation in a conspiracy is accountable in sentencing for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). It follows that Lyons can be held accountable for the loss that stemmed from the non-payment of equipment suppliers by Pace and Greenfield if, but only if, these acts were in furtherance of their jointly undertaken criminal activity and were reasonably foreseeable by Lyons.

The District Court did not rule on whether *all* the frauds perpetrated by Pace and Greenfield against equipment suppliers were reasonably foreseeable by Lyons and were in furtherance of the conspirators' jointly undertaken criminal activity. The Court did find that Lyons could reasonably foresee that Pace and Greenfield would not pay for the phony ATM machine placed in the Buckland Mall. But the ATM machine accounts for only around $20,000 of the value of the fraudulently-obtained equipment. The District Court made no findings whatsoever concerning the remaining $80,000 worth of equipment that had been "stolen" by Pace and Greenfield. The Government concedes all this in its brief, and thus, as the Government recognizes, we must remand for further findings before we can determine what portion of the fraudulently-obtained equipment, and hence what part of the $100,000 total loss to the suppliers, can properly be attributed to Lyons. *See United States v. Negron,* 967 F.2d 68, 72–73 (2d Cir.1992) (remanding for further findings on whether co-defendants' activity was within the scope of defendant's agreement and was reasonably foreseeable to defendant).[6]

### B. Withdrawal from Conspiracy

■ Lyons claims that he withdrew from the conspiracy on May 14 and should not be held accountable for losses caused by the conspiracy after that date. The District Court rejected Lyons's contention and held that, even accepting the description of Lyons's acts as true, these acts would still not be sufficient to amount to a withdrawal from the conspiracy. The Government conceded at oral argument that this holding was incorrect, and once again, we agree.

As this Circuit has explained, though the cessation of conspiratorial activity is generally considered insufficient to demonstrate a withdrawal from a conspiracy, "either the making of a clean breast to the authorities, or communication of the abandonment in a

---

**6.** In reviewing the sentencing transcript, we were also left in doubt as to whether the *non-payment* of the equipment suppliers was "in furtherance of the jointly undertaken criminal activity" that Lyons entered. Lying to the suppliers about the use to which the machines were to be put certainly was necessary to the scheme. But the non-payment could be said to have hampered the scheme rather than to have furthered it, because non-payment might raise suspicions as to the use to which the equipment would be put. It is difficult to ascertain from Lyons's brief whether he raises this issue on appeal. Nevertheless, since a finding of "furtherance" is required under U.S.S.G. § 1B1.3(a)(1)(B) if the acts of Greenfield and Pace are to be attributed to Lyons, we recommend that the District Court make clear its determinations in this regard. *See Negron,* 967 F.2d at 72–73.

manner reasonably calculated to reach co-conspirators" is sufficient to establish withdrawal. *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964) (citations omitted), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). *Accord United States v. Minicone*, 960 F.2d 1099, 1108 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992); *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir.1988). If Lyons's claims—that, at a meeting with Pace, he clearly explained that he no longer wished to be part of the conspiracy—are true, then Lyons clearly communicated an "abandonment [of the conspiracy] in a manner reasonably calculated to reach co-conspirators," and thus adequately established his withdrawal from the ATM scheme.

■■■■ A conspiracy exists when persons combine and agree for the purposes of committing an unlawful act, *see* Black's Law Dictionary 309–10 (6th ed. 1990). A defendant withdraws from a conspiracy when he or she abandons the combination and agreement. But, since it is all too easy after the fact for a defendant to claim that he or she withdrew from a plot, the law generally requires the taking of some "affirmative action," *Borelli*, 336 F.2d at 388. Indeed, "[u]nless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir.1976) (citing *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977).

■■■ The point of such "affirmative evidence" requirements, though, is not to compel a conspirator to inform on his or her co-conspirators or to warn-off possible victims, admirable as those actions might be. It is

rather to make sure that a withdrawal did occur and is not simply being invented *ex post*. Lyons gave evidence of his withdrawal. The District Court treated that evidence as true. We hold that the District Court could not accept Lyons's factual claims as true and still rule that his withdrawal did not occur.

Since the District Court erred in concluding that Lyons's alleged actions were insufficient, as a matter of law, to constitute a withdrawal from the conspiracy, we must remand for reconsideration of Lyons's withdrawal claim. If Lyons took the actions he claims to have taken, these would be sufficient to establish his withdrawal from the ATM conspiracy. On remand, the Court must determine whether Lyons did, in fact, do what he said he did.[7]

---

7. Because the Fraud Guideline specifies offense-level increases only when the loss surpasses fixed plateaus, *see* U.S.S.G. § 2F1.1(b)(1), it is possible that Lyons's final offense level would not be reduced even if he were to demonstrate his withdrawal. The Government and Lyons have not specified the amount of the loss stemming from the ATM conspiracy after the date of Lyons's alleged withdrawal. As a result, we cannot say whether the alleged withdrawal would have any actual impact on Lyons's offense level. Before it

seeks to resolve the substantive merits of the withdrawal claim, it might be well for the District Court to determine whether Lyons's withdrawal claim would affect his final offense level at all. This entails (1) ascertaining the amount of loss from the ATM conspiracy which occurred after Lyons's alleged withdrawal, and (2) resolving the issue of Lyons's accountability for the value of the equipment obtained by Pace and Greenfield.