UNITED STATES of America,
Appellee,

v.

Patrick BENNETT, Defendant–
Appellant.

Docket No. 00–1330.

United States Court of Appeals,
Second Circuit.

Argued: May 1, 2001.

Decided: May 31, 2001.

Paul E. Wagner, Ithaca, NY, (Michael D. Pinnisi, Brown, Pinnisi & Michaels, Ithaca, NY, on the brief), for defendant-appellant.

Patrick J. Smith, Asst. U.S. Atty., New York, NY, (Mary Jo White, U.S. Atty., Richard D. Owens, John P. Collins, David Raymond Lewis, Asst. U.S. Attys., New York, NY, on the brief), for appellee.

Before: NEWMAN and CABRANES, Circuit Judges; and THOMPSON,[*] District Judge.

JON O. NEWMAN, Circuit Judge.

This appeal primarily concerns the authority of a sentencing judge to enhance a defendant's sentence because his wife refused to surrender properties alleged to have been purchased with proceeds of the defendant's crimes. Patrick Bennett appeals from the July 5, 2000, judgment of the United States District Court for the Southern District of New York (John S. Martin, Jr., District Judge), convicting him, after a jury trial, of various offenses, including money laundering, and sentencing him to a term of thirty years. The sentence resulted from an upward departure of ten years imposed because of the wife's recalcitrance. We conclude that the challenged departure is not permissible because it undermines the wife's statutory entitlement to resist forfeiture of her interest in the properties at issue. The Defendant's challenges to his conviction have been rejected in a summary order filed this date. In this opinion, we vacate the sentence and remand for resentencing.

## Background

Bennett was the chief financial officer of Bennett Financial Group (BFG), a family business nominally headed up by his parents, based in Syracuse. The firm leased photocopying machines, primarily to offices in state and local governments. After originating a lease, the firm often sold the lease to an investor; BFG would collect payments on the lease for the investor, who was supposed to get a low-risk stream of cash.

The indictment alleged offenses of four kinds. First, Bennett allegedly ran a massive pyramid scheme through BFG, selling fictitious leases to investors and pledging or selling legitimate leases twice over to different parties. These pyramid scheme allegations supported mail fraud and securities fraud counts. Second, Bennett allegedly shifted the cash generated by pyra-

---

[*] Honorable Alvin W. Thompson of the United States District Court for the District of Connecticut, sitting by designation.

mid sales into an unaudited shell company, supporting several money laundering counts. Third, Bennett allegedly inflated BFG's profitability in financial statements submitted to banks and investors who loaned money to BFG. These allegations supported bank fraud and additional securities fraud counts. Fourth, Bennett deceived SEC investigators, supporting public integrity counts such as perjury and obstruction of justice.

There have been two trials. At each trial, the Government submitted evidence that would have permitted conviction on all the counts and that sufficed to permit sentencing for conduct not resulting in convictions. The first jury convicted only on the public integrity crimes, and hung on all the other issues. The second jury also hung on the pyramid scheme counts, but convicted on the money-laundering counts and on the bank fraud and securities fraud counts related to the inflated financial statements. This jury also returned a forfeiture verdict of $109 million.

Judge Martin conducted several sentencing hearings. First, he heard objections to the presentence report, and determined that Bennett's adjusted offense level under the Sentencing Guidelines was 36.[1] In Criminal History Category I, an offense level of 36 yielded a sentencing range of 188 to 235 months. Judge Martin made clear at this hearing that "it was very important that every dollar of money that [Bennett] and his family had taken from the investors in this case be repaid." A few months later, he held a second hearing to determine whether Bennett was withholding proceeds of his frauds. Judge Martin determined that certain assets in the name of Bennett's wife were fraud proceeds, including the family home and stock interests in a race track and a hotel. At this hearing, Judge Martin also made two rulings in advance of the final sentencing. First, he said that "the massive nature of the fraud, and the impact on the victims" justified an upward departure of five months. He also noted that "Mr. Bennett and his wife are still endeavoring to keep the proceeds of the fraud," and said that "based on [this] fact" he would additionally depart upward ten years, for a total sentence of 360 months (30 years), if the assets in question were not voluntarily surrendered before the final sentencing hearing. "Therefore, if at the time I come to impose sentence, these assets are not returned, I will impose a sentence of 360 months. So it is either 20 years or 30 years. The determination of that is [up] to Mr. and Mrs. Bennett." At the time, separate forfeiture proceedings were pending, in which Bennett's wife would have the opportunity to assert an innocent owner defense with respect to the assets in question.

The final sentencing hearing occurred a month later, on April 28, 2000. Bennett's counsel sought to avoid the threatened 10-year departure by contending that two of the three assets at issue were no longer effectively under Mrs. Bennett's control. He contended that the racetrack stock was the subject of an interpleader action and

---

1. 36 was the adjusted offense level for the "group" of fraud offenses. *See* U.S.S.G. Part D (1988) (grouping rules). This level was derived from a base offense level of 6, *id.* § 2F1.1(a), and enhancements of 18 for losses of more than $80 million, *id.* § 2F1.1(b)(1)(S), 2 for more than minimal planning, *id.* § 2F1.1(b)(2), 4 for affecting a financial institution and receipts exceeding $1 million, *id.* § 2F1.1(b)(7)(B), 4 for being a leader of a criminal activity with more than five participants or that was otherwise extensive, *id.* § 3B1.1, and 2 for obstruction of justice, § 3C1.1. Judge Martin elected to use the adjusted offense level for the fraud group after concluding that the higher adjusted offense level for the money-laundering group of offenses was inapplicable because he considered Bennett's offenses not to be a "heartland" money-laundering offense.

that she was negotiating an agreement to sell her stock in the hotel.[2] He claimed that she was relinquishing all claim to these two assets, but conceded that she was refusing to surrender the family home and surrounding acreage.

Judge Martin made no finding as to whether the racetrack stock and the hotel stock were no longer under Mrs. Bennett's control, as defense counsel contended. After affording Bennett his right of allocution, Judge Martin imposed an aggregate sentence of thirty years, noting explicitly that the ten-year component of the upward departure would not have been imposed had Bennett and his wife surrendered their assets.[3] He also granted the Government's application for an order requiring Bennett to forfeit $109 million. An amended order of forfeiture was entered on October 5, 2000, forfeiting all of the Defendant's interests in three properties, two of which are identified in the order as

held in the name of Mrs. Bennett.[4] In a memorandum decision, Judge Martin denied as premature Mrs. Bennett's request to intervene to assert claims to the forfeited properties. The forfeiture order is subject to a separate appeal.

Discussion

I. Upward Departure

Bennett challenges his sentence primarily on the ground that the District Court erred in enhancing the sentence by ten years because of the refusal of Bennett's wife to surrender her interest in the family home and other assets. We find very little precedent bearing on this issue. It is unusual for a sentencing judge to select a presumptive sentence and then state that the sentence will be increased if some action the judge deems appropriate is not taken.[5] It is even more unusual to use the threat of an increased sentence to compel action by someone other than the defen-

---

**2.** Mrs. Bennett worked at the hotel, and sought to exchange her stock for one year's salary.

**3.** The record is clear that Judge Martin imposed the upward departure because Bennett and his wife refused to surrender the house and surrounding acreage. Judge Martin's reference to their failure to surrender "assets" strongly implies that he was not persuaded by defense counsel's representations concerning the racetrack stock and the hotel stock, and was basing the upward departure on the failure to surrender these assets as well.

**4.** The three properties listed in the amended order of forfeiture are the family home and surrounding 98–acre lot in Oneida, New York, in the name of Gwen Bennett, another lot in Oneida in her name, and a lot in Sherrill, New York, in the name of The Andrick Irrevocable Trust. Of these three properties, only the family home and surrounding acreage are among the properties that Judge Martin indicated had to be surrendered by the Bennetts to avoid the ten-year enhancement of the Defendant's sentence.

**5.** This situation is superficially similar to that of a defendant who receives a higher sentence upon conviction after trial than he would have received if he had pled guilty. However, as we have previously explained, the lower sentence after a guilty plea reflects a "reduction from a sentencing norm ascertained independent of the procedure by which guilt is ascertained. A sentence imposed upon a defendant who stands trial is that norm; it is not an enhancement above the norm as a cost of standing trial." *United States v. Cruz,* 977 F.2d 732, 734 (2d Cir.1992). The lawfulness of a discount for pleading guilty is well settled. *See Corbitt v. New Jersey,* 439 U.S. 212, 219, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978); *Brady v. United States,* 397 U.S. 742, 750–51, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Cruz,* 977 F.2d at 733–34; *United States v. Parker,* 903 F.2d 91, 105 (2d Cir.1990). We have prohibited an increased sentence "above an otherwise appropriate sentencing norm" where the trial judge's pretrial statements to the defendant "created an unacceptable risk ... [of] penaliz[ing] the defendant for exercising his constitutional right to stand trial." *Cruz,* 977 F.2d at 734.

dant.[6] We need not explore generally the extent of a sentencing judge's authority to use the threat of increased punishment to compel action by a defendant or another person because in this case the use of such power conflicts with the statutory remedy that Congress has established to recapture the proceeds of various unlawful activities, including money laundering. *See* 18 U.S.C. § 982. That remedy is available to recapture proceeds in the hands of a third party, *id.* § 982(b)(1) (incorporating provisions of 21 U.S.C. § 853(c)), subject to the third party's opportunity to establish a right of ownership superior to the Government's or a status as a bona fide purchaser reasonably without cause to believe that the property was subject to forfeiture, *see* 21 U.S.C. § 853(n)(6).

 In this case, the threat of enhanced punishment in the event that the Defendant's wife does not surrender properties she claims are hers would undermine the statutory right accorded her by the forfei-

ture statute. The Government has obtained an order of forfeiture for at least one of the properties at issue—the family home. That proceeding, which is the subject of a separate appeal, will determine whether this and other properties have been forfeited to the Government or belong to Mrs. Bennett. The ten-year sentencing enhancement was designed to cause her to surrender her statutory rights (whatever their ultimate merit), and the impermissibility of imposing punishment for that purpose is not avoided simply because Mrs. Bennett stood her ground and refused to accept the sentencing judge's offer not to enhance her husband's sentence if she capitulated.

Judge Martin expressed the view that his enhancement was analogous to the sentencing that we approved in *United States v. Merritt*, 988 F.2d 1298 (2d Cir.1993). In *Merritt*, Judge Martin departed upward in sentencing a defendant for conspiracy to

---

**6.** We have located two reported cases in which a prosecutor afforded a defendant the benefit of a favorable plea bargain only on condition of action by others. In *United States v. Clements*, 992 F.2d 417 (2d Cir. 1993), the Government offered a group of codefendants a plea bargain conditioned on its acceptance by all of them. *Id.* at 418. The appellant, who had accepted the plea bargain, later tried to withdraw his plea, contending that the joint plea arrangement was "inherently coercive," *id.* at 419. We rejected that claim on the ground that a prosecutor "may impose conditions [in a plea agreement] which relate to the conduct or treatment of others." *Id.* (citing *United States v. Marquez*, 909 F.2d 738 (2d Cir.1990)). By citing *Marquez*, we evidently understood Clements to be contending that there was undue pressure on him to plead, arising from the fact that his codefendants would not benefit from the plea bargain unless he pled. We ruled, following *Marquez*, that the voluntariness of a guilty plea is not undermined just because the plea is induced by a defendant's desire to benefit others. Clements's case would be more analogous to Bennett's if Clements had gone to

trial after his co-defendants turned down the plea, and he had then complained that he had been denied favorable treatment because they had refused to plead.

In *United States v. McHan*, 966 F.2d 134 (4th Cir.1992), a defendant was offered a favorable plea bargain conditioned on his wife's forfeiture of property. *See id.* at 137. When she refused, his trial was scheduled. His (interlocutory) appeal raised only a double jeopardy claim, based on a prior conviction and did not challenge the conditioning of a favorable plea agreement on her conduct. The double jeopardy claim was rejected, but the condition of the refused plea bargain evoked strong criticism from one judge of the panel: "[W]hen the value of a prisoner is measured by the sum others might pay for the state's leniency, I am forced to ponder whether the morality of government has improved in the past six hundred years." *Id.* at 142 (Hall, J., concurring).

Neither *Clements* nor *McHan* involves a threat by a prosecutor or a judge to accord a defendant adverse treatment in the event that a third party fails to act.

defraud the United States. We described the grounds of the departure as follows:

> The defendant, having obtained nearly $1 million through a fraud scheme, concealed the large proceeds through a series of disguised international corporate and bank transactions; even after his guilty plea, the defendant engaged in an elaborate scheme, which included falsely claiming to have paid for the merchandise, fraudulently concealing his ownership of real property, and falsely claiming to be no longer in possession of the benefits of the fraud, with the result that, after service of a modest period of imprisonment, he would enjoy the remainder of his life cushioned by the concealed million dollar fraud proceeds.

*Id.* at 1306. We affirmed the sentence, rejecting the defendant's contention that it was impermissibly based on factors already adequately considered by the Sentencing Commission—failure to pay restitution and concealment of assets. *Id.* at 1310–11. We concluded that Judge Martin was entitled to find that Merritt's conduct went far beyond "simple" failure to pay restitution and concealment, and that his "elaborate fraudulent manipulation" was an aggravating circumstance warranting an upward departure under 18 U.S.C. § 3553(b). *Merritt*, 988 F.2d at 1311.

Bennett's case would arguably be analogous to Merritt's if Judge Martin had imposed the enhancement as added punishment for Bennett's own conduct in transferring to his wife's name assets obtained from proceeds of the crimes. In that event, the issue would be whether the departure standard has been met, *i.e.*, whether there were circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). However, the enhancement for Bennett was explicitly imposed because he *and his wife* refused to surrender the properties. As Judge Martin made clear at sentencing, "If Mr. and Mrs. Bennett appeared in this courtroom today and said that all of the assets under their control would be turned over to the trustee to benefit the investors in this case, I would impose a 20–year sentence." Whether or not Mrs. Bennett was refusing at the Defendant's behest, which Judge Martin believes,[7] he cannot be punished because she will not relinquish her statutory right to contest the forfeiture of properties in her name.

Some might suggest that, even if a defendant may not have his sentence enhanced because of his wife's failure to surrender alleged proceeds of his crimes, he should receive additional punishment for his own failure to urge her to do so. The difficulty with this argument is that it too easily becomes an indirect way to punish for the wife's refusal: a husband who claims to have urged his wife to surrender the property will risk being disbelieved unless his wife complies; realizing that risk, the wife is pressured to comply to spare her husband the additional time that would be imposed because of the sentencing judge's disbelief that the husband has sincerely urged her to capitulate. Such risks are avoided by limiting sentencing enhancements, otherwise appropriate, to a defendant's own egregious conduct in concealing the proceeds of his crimes, leaving the Government free to use its ample re-

---

7. At sentencing Judge Martin said, "Indeed, his continued use of these assets by him and his family, which he controls, and that was quite clear from the letter that he sent to me, there is no claim here that Mrs. Bennett isn't willing to do this, but Mr. Bennett wants it. It's quite clear from all his statements to the court that this is conduct he is controlling." In fact Mrs. Bennett testified that she was not willing to surrender the properties: "It's an admission of guilt, and I just can't do that. I can't belittle myself that way. I truly believe that they are mine."

sources to obtain forfeitable property held by others. On remand, Judge Martin will be entitled to consider whether, apart from Mrs. Bennett's refusal to surrender the properties, the Defendant's own acts of concealment or any other appropriate factors warrant a departure above the twenty-year sentence he stated would have been imposed had the properties been surrendered.

We fully understand Judge Martin's concern to aid the victims of Bennett's crimes. He was anxious not only to restore to them at least a portion of their losses but also to avoid the distress of their "see[ing] his wife living in luxury on ... assets purchased with their money." Despite the legitimacy of these objectives, they may not be achieved by the threat of added punishment for Bennett unless his wife surrenders her statutory right to contest the forfeiture of properties that are at least nominally hers.

## II. Other Sentencing Challenges

Bennett's other challenges to his sentence are without merit and require little discussion.

*Evidentiary standard.* Bennett contends that, because the loss calculation was significantly augmented by the relevant conduct of the pyramid-scheme offenses on which no verdicts were returned, Judge Martin should have been required to establish this conduct beyond a reasonable doubt. He relies on dictum in *United States v. Shonubi*, 103 F.3d 1085 (2d Cir. 1997), that was rejected in *United States v. Cordoba–Murgas*, 233 F.3d 704, 708 (2d Cir.2000) (preponderance standard proper to sustain large upward adjustments or upward departures); *see also United*

States v. Watts, 519 U.S. 148, 154–57, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (preponderance standard may be used at sentencing to establish conduct for which a defendant was acquitted).[8] Moreover, Judge Martin found that the evidence "established beyond any conceivable doubt that [Bennett] was the prime mover in a fraud that took hundreds of millions of dollars from the victim investors." *United States v. Bennett*, No. 97 CR 639 JSM, 2000 WL 420547, at *1 (S.D.N.Y. Apr.18, 2000).

■ *Fraud loss.* Bennett challenges the District Court's finding of a fraud loss of more than $80 million. Judge Martin indicated that he had "reviewed the presentence report, reviewed the voluminous submissions with respect to the sentencing and accept[ed] the determination of the Probation Department with respect to the calculation of the guideline range with respect to the fraud guideline." The Probation Department estimated loss for the pyramid scheme only. With respect to this scheme, the Probation Department found that the annual income from the sale of lease products to investors exceeded the value of the leases originated by more than $200 million in 1994 and again in 1995. By the time BFG filed for bankruptcy, the aggregate shortfall between the amount owed lease investors and the value of the collateral was approximately $600 million. A court, relying on findings of the Probation Department, "need only make a reasonable estimate of the loss, given the available information," U.S.S.G. § 2F1.1, cmt. n. 9, and we are satisfied that Judge Martin properly estimated a loss substantially in excess of $80 million.

---

8. "[T]he *Shonubi* statements are better understood as an expression of concern that, in certain cases, the enhancement of a sentence based upon a defendant's 'relevant conduct,' if done without regard to the weight of the evidence proving the relevant conduct, may result in a total term of incarceration which is excessive, inappropriate, and unintended under Sentencing Guidelines." *Cordoba–Murgas*, 233 F.3d at 708 (citation omitted).

*Affecting a financial institution.* Bennett challenges the four-level enhancement that is authorized "[i]f the offense ... affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2F1.1(b)(7)(B). A defendant must "individually" derive $1 million from the offense, and gross receipts include all amounts "obtained directly or indirectly as a result of the offense." *Id.* § 2F1.1 cmt. n. 18. The presentence report documented fraudulent bank borrowings of $407 million by BFG; transfers of $1 billion from BFG to Bennett Management and Development Corporation ("BMDC"), a shell company owned by Bennett and his brother; and distributions of $13 million from BMDC to Bennett's personal bank and brokerage accounts.

Bennett contends that he "received no direct personal benefit" from the bank loans, Brief for Appellant at 78, claiming that the loan proceeds were "used to purchase the leases sold to the banks." Reply Brief for Appellant at 55. Whether or not all the loan proceeds were used to purchase leases, the enhancement is available for a defendant who derives at least $1 million "*indirectly* as a result of the offense." U.S.S.G. § 2F1.1 cmt. n. 18 (emphasis added). There is no serious dispute that the fraudulent bank loans facilitated the fraudulent schemes that enabled Bennett to shift millions of dollars from BFG to BMDC and then into his personal accounts. *See United States v. Monus,* 128 F.3d 376, 397 (6th Cir.1997) ("[T]he defendant must derive a million dollars from the offense, not from the financial institutions.").

*Organizer.* Bennett challenges the enhancement for being an organizer or leader of a criminal activity with five or more participants. *See* U.S.S.G. § 3B1.1(a). Whether or not his activity involved five participants, the enhancement applies so long as the criminal activity was "otherwise extensive," for example, a fraud involving the "unknowing services of many outsiders." *Id.* cmt. n. 3. This circumstance is applicable to Bennett's conduct because his frauds involved a wide array of witting or unwitting brokers, accountants, and bankers. Bennett also argues that his planning was double-counted to support both the organizer enhancement under section 3B1.1(a) and the enhancement for "more than minimal planning, or ... a scheme to defraud more than one victim" under section 2F1.1(b)(2). However, both enhancements were properly applied. Section 2F1.1(b)(2) provides that the two-level enhancement may be premised on more than minimal planning *or* the fact that "more than one victim" was defrauded, and both grounds applied to Bennett. Where, as here, there are multiple fraud victims, Bennett's role as planner could be used to support the four-level increase under section 3B1.1(a) without precluding application of section 2F1.1(b)(2). *Compare United States v. Greenfield,* 44 F.3d 1141, 1146 n. 3 (2d Cir.1995) (same planning conduct cannot be used to justify both enhancements).

*Obstructing justice.* Bennett contends that his offense level should not have been increased for obstructing justice, U.S.S.G. § 3C1.1, because he obstructed only the SEC investigation, and not his criminal prosecution. However, the enhancement applies to efforts to obstruct an "official investigation," *id.* cmt. n. 4(d), which includes investigations that occur prior to the indictment. *See also United States v. Zagari,* 111 F.3d 307, 328 (2d Cir.1997) (enhancement can be premised on obstruction of civil investigation closely related to criminal prosecution).

*Eighth Amendment.* Finally, Bennett challenges his sentence as being so disproportionate to his conduct as to

violate the Eighth Amendment. Our review of such challenges is very limited. In assessing the constitutionality of a sentence under the Eighth Amendment, the court must assess the gravity of the offense and the harshness of the penalty, the sentences imposed on other criminals in the same jurisdiction, and the sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Whether the final sentence is thirty years or twenty years (or something in between), we think there is no disproportion between sentence and conduct. Bennett's conduct wiped out the savings of thousands of people, and is not longer than the sentences meted out in other large fraud cases. *See United States v. Helms*, 897 F.2d 1293, 1299 (5th Cir.1990) (fraud sentences of 75 years and 60 years were not disproportionate), *overruled on other grounds, United States v. Huntress*, 956 F.2d 1309, 1317 (5th Cir.1992); *United States v. Hoffenberg*, Nos. 94 Cr. 213(RWS), 95 Cr. 321(RWS), 1997 WL 96563 (S.D.N.Y. March 5, 1997) (twenty year sentence where loss to investors was $478 million).

### Conclusion

The sentence is vacated and remanded for further proceedings consistent with this opinion.