**UNITED STATES of America,**
**Appellee,**

v.

**David LIVINGSTON, also known as "Kenneth Maxwell," also known as "Arnold Striggles," also known as "John Michaels," also known as "Todd Mueller," also known as "Musain," Defendant–Appellant.**

**Docket No. 00–1812.**

United States Court of Appeals,
Second Circuit.

Dec. 21, 2001.

Christopher J. Morvillo, Assistant United States Attorney; Baruch Weiss, Assistant United States Attorney of counsel; Mary Jo White, United States Attorney, on the brief, United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

David A. Lewis, The Legal Aid Society, Federal Defender Division Appeals Bureau, New York, NY, for Appellant.

Present LEVAL, CABRANES, and STRAUB, Circuit Judges.

### SUMMARY ORDER

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of said District Court be and hereby is AFFIRMED.

Defendant David Livingston timely appeals from a judgment of conviction entered by the District Court on December 18, 2000. Livingston contends that his sentence should be vacated and the case should be remanded to the District Court principally because the District Court erred in imposing Livingston's sentence based on findings that Livingston obstructed justice and that the loss amount from his schemes exceeded $900,000.

On or about January 25, 2000 and January 31, 2000, David Livingston entered the Clerk's Office for the United States Court of Appeals for the Second Circuit in Manhattan and reviewed the court files in at least 16 different cases, including *United States v. Stokes*, 96 Cr. 481(SAS). Livingston obtained the name and telephone number of Stokes' wife, who co-signed Stokes' personal recognizance bond, and

called her, claiming to be a representative from the Court of Appeals.

During the subsequent conversation, Livingston stated that Stokes' husband could be released from prison that day if she paid a $15,000 bond. Ms. Stokes replied that she thought she only had to post 10% of any bond. Livingston agreed, then directed her to wire $1,500 via Western Union to the "United States District Court of New York" with her husband's name and case number. After the money was not claimed, Stokes pulled it back, minus a $100 transfer fee. Ultimately, Ms. Stokes learned that her husband's conviction had not been overturned and that he was still incarcerated.

On March 27, 2000, while incarcerated, Livingston directed his friend, Richard Montford, to go to the United States Courthouse at 500 Pearl Street in Manhattan and to remove letters of support from the District Court's file in a well-publicized conspiracy case involving a defendant named Alastair Duncan. At Livingston's direction, Montford copied the names and telephone numbers of Duncan's supporters and provided this information to Livingston.

Livingston then began to call Duncan's supporters, posing variously as Duncan's attorney, as a representative of the District Attorney's Office, as an FBI agent, as a Department of Corrections Officer, and as "Alastair Duncan" himself. In all, Livingston contacted or attempted to contact at least 49 of the people who wrote letters for Duncan. He told each victim he contacted that Duncan—who in reality was out on bail pending appeal—was desperately trying to raise $250,000 for bail. He typically told his victims that Duncan needed to borrow the balance of the bail money, in the amount of either $19,000 or $20,000. Two victims sent Livingston money to help Duncan get out of jail—one of whom wired $40,000 to Livingston's bank accounts, while another left a $2,700 check with his doorman which was picked up at Livingston's direction, but never cashed.

An Indictment was filed against Livingston on June 14, 2000, charging thirteen counts of wire fraud relating to the Duncan scheme and two counts of wire fraud relating to the Stokes scheme. Livingston entered a plea of guilty to Count Ten, 18 U.S.C. § 1343, and a plea of not guilty to the remaining fourteen counts. On July 25, 2000, Livingston and the Government entered into a plea agreement (the "Agreement") pursuant to which the defendant agreed, *inter alia*, to plead guilty to one additional count relating to the Duncan scheme (Count One) and to one count relating to the Stokes scheme (Count Fourteen).

Pursuant to the Agreement, the Government would dismiss all open counts against Livingston at the time of sentencing. The Agreement set the loss amount attributable to Livingston's fraud to between $120,000 and $1,500,000 and allowed the parties to argue where within that range the loss should be calculated.

On December 15, 2000, the Court conducted a hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), to determine whether to enhance Livingston's sentence for obstruction of justice. At the *Fatico* hearing, the Court determined that on September 26, 2000 and October 6, 2000, Livingston obstructed justice by attempting to escape from prison.

On December 18, 2000, the Court sentenced Livingston. It set his base offense level at six, pursuant to the United States Sentencing Guidelines ("U.S.S.G.") § 2F1.1. It then noted that the appropriate enhancement for the amount of loss result-

ed in either an eight-level enhancement under the defense theory, or an eleven-level enhancement under the Government theory. The Court then reiterated its earlier determination from the *Fatico* hearing that Livingston would receive a two-level enhancement pursuant to U.S.S.G. § 3C1.1, for obstructing justice when Livingston attempted to escape from prison. The District Court also awarded no reduction in offense level for acceptance of responsibility, presumably because of its finding of obstruction of justice. In addition, it found that a two-level enhancement for "more than minimal planning" applied. U.S.S.G. § 2F1.1(b)(2). Thus, the Court concluded that, before considering any upward departure, the offense level was either 18 under the defense theory of loss or 21 under the Government theory of loss.

The District Court then stated that it had "absolutely no doubt that a substantial upward departure is warranted" because Livingston is a "thoroughly hardened recidivist" and given "how dangerous he is." Accordingly, the Court departed upward to level 26. The Court then sentenced Livingston to 135 months incarceration, three years supervised release, $40,000 restitution, and a $300 special assessment.

On appeal, Livingston principally challenges the findings of obstruction of justice and loss amount. Livingston argues that the District Court committed clear error in finding that he had the intent to escape from the Metropolitan Correctional Center ("MCC") on September 26, 2000 and October 6, 2000, and further that it erred when it concluded that Livingston's conduct constituted a "substantial step" towards an escape.

■ As it happens, the District Court had ample evidence to conclude that Livingston had the intent to escape and took a substantial step toward that end. *See United States v. Shoulberg*, 895 F.2d 882,

885 (2d Cir.1990). The Court found that "a few days before the first of these two current escapes ... the defendant told Lieutenant Carrino that he could leave the institution whenever he wished; he could simply bleed out." On each date, Livingston was observed in his cell after appearing to have swallowed something (in the first incident, blood appeared all around his cell) and was transferred to a hospital outside the prison for medical attention. Moreover, these two incidents were similar to two earlier escapes from prison by Livingston in which he swallowed foreign objects or feigned doing so, was transferred to a medical facility, and then escaped. In addition, Livingston's actions to get himself transported to an outside hospital certainly constituted the requisite substantial step toward escape. Accordingly, the District Court did not err in sentencing based in part on a finding of obstruction of justice.

■ The District Court also did not err in its resolution of the loss amount. " '[A] court need only make a reasonable estimate of the loss, given the available information,' " U.S.S.G. § 2F1.1, cmt. n. 9; *see also United States v. Bennett*, 252 F.3d 559, 565 (2d Cir.2001), "based on the approximate number of victims and an estimate of the average loss to each victim." U.S.S.G. § 2F1.1 cmt. n. 9. In the instant case, Livingston admitted obtaining the list of at least 49 names and phone numbers of supporters from the Duncan file. And he stipulated to the solicitations and telephone calls that the Government ascribed to him, as well as the amounts he solicited. Of the supporters from whom he solicited money, the most common amount Livingston requested was $19,000. Accordingly, the District Court did not err in concluding that the loss amount yielded an offense

level between 18 and 21.[1]

We have reviewed all of the defendant's arguments, including those he asserted in his *pro se* brief. For the reasons set forth above, the judgment of the District Court is hereby AFFIRMED.

---

1. Moreover, the defendant admitted a loss amount of $280,000, which corresponds to an 8 level increase in the offense level. U.S.S.G. § 2F1.1(b)(1)(I). Such an increase, when combined with enhancements for obstruction of justice and more than minimal planning corresponds to an offense level of 18, which is within the range relied upon by the District Court in sentencing.