06-2443-pr
Bennett v. USA

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Submitted: March 30, 2011                                        Decided: December 9, 2011)

Docket No. 06-2443-pr

_____

PATRICK BENNETT,

Petitioner-Appellant,

- v. -

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Before: KEARSE, SACK, and KATZMANN, Circuit Judges.

Appeal from an order of the United States District Court for the Southern District of New York, Paul A. Crotty, Judge, following an evidentiary hearing on a remand pursuant to United States v. Jacobson, 15 F.3d 19 (2d Cir. 1994), denying petitioner's motion under 28 U.S.C. § 2255 to set aside certain convictions on the ground of ineffective assistance of counsel. See 2009 WL 3614613 (S.D.N.Y. Nov. 3, 2009).

Affirmed.

GALGANO & ASSOCIATES, White Plains, New York (George W. Galgano, Jr., White Plains, New York, Michael D. Pinnisi, Pinnisi & Anderson, Ithaca, New York, of counsel), for Petitioner-Appellant, and Patrick Bennett, Loretto, Pennsylvania, pro se.

PREET BHARARA, United States Attorney for the Southern District of New York, New York, New York (Peter M. Skinner, Andrew L. Fish, Assistant United States Attorneys, New York, New York, of counsel), for Respondent-Appellee.

KEARSE, Circuit Judge:

This appeal returns to us from the United States District Court for the Southern District of New York, Paul A. Crotty, Judge, following an evidentiary hearing and findings on a Jacobson remand from this Court, see United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994), with respect to the district court's denial of petitioner Patrick Bennett's motion pursuant to 28 U.S.C. § 2255 to vacate his convictions--following two trials--for securities fraud, bank fraud, and money laundering on the ground that he received ineffective assistance of counsel. In support of that claim, Bennett alleged that there were numerous defects in counsel's performance; he was granted a certificate of appealability to seek review with respect to two such allegations, to wit, (1) that his attorneys overrode his desire to testify at his second trial, and (2) that counsel interfered with his right to testify by failing to object to jury instructions on intent and good faith ("mens rea" instructions). The district court, following its evidentiary hearing on remand with respect to those two issues, found that counsel had advised Bennett of his absolute right to testify and to decide for himself whether or not to testify, and that Bennett had accepted, without complaint, their advice that he not testify; the court found Bennett's testimony to the contrary not credible. The court also found that the unchallenged mens rea instructions caused Bennett no prejudice. On this reinstated appeal, Bennett contends principally that the district court erred in its credibility assessments and that this Court should grant him a new trial on the ground that his attorneys (a) failed to inform him that he had the rights to testify and to decide whether or not to testify at his second trial, (b) overrode his desire to testify at that trial, or (c) failed to protect his right to testify

because they failed to object to the mens rea instructions. Bennett also contends that the certificate of appealability should be expanded to encompass other alleged errors of counsel. For the reasons that follow, we reject his contentions and affirm the district court's denial of the § 2255 motion.

# I. BACKGROUND

The proceedings leading to this appeal--beginning with a 106-count indictment and including two trials (before different judges) resulting in Bennett's conviction on a total of 49 counts, a § 2255 motion (and a supplement thereto) before a third judge, three appeals, and two remands--are summarized below.

## A. Bennett's Convictions and Direct Appeals

Bennett was the chief financial officer of a family business called Bennett Financial Group ("BFG"). The crimes of which he was convicted are described generally in United States v. Bennett, No. 00-1330 (2d Cir. May 31, 2001) ("Bennett I") (summary order), and United States v. Bennett, 252 F.3d 559 (2d Cir. 2001) ("Bennett II"), cert. denied, 535 U.S. 932 (2002).

The indictment alleged offenses of four kinds. First, Bennett allegedly ran a massive pyramid scheme through BFG, selling fictitious leases to investors and pledging or selling legitimate leases twice over to different parties. These pyramid scheme allegations supported mail fraud and securities fraud counts. Second, Bennett allegedly shifted the cash generated by pyramid sales into an unaudited shell company, supporting several money laundering counts. Third, Bennett allegedly inflated BFG's profitability in financial statements submitted to banks and investors who loaned money to BFG. These allegations supported bank fraud and additional securities fraud counts. Fourth, Bennett deceived SEC investigators, supporting public integrity counts such as perjury and obstruction of justice.

There have been two trials. At each trial, the Government submitted evidence that would have permitted conviction on all the counts . . . .

Bennett II, 252 F.3d at 560-61.

At his first trial, which ended in March 1999, Bennett testified that in connection with an investigation into BFG by the Securities and Exchange Commission ("SEC") he, inter alia, gave the SEC sworn testimony that was false, submitted documents that he had fabricated or backdated, and instructed others to give false statements and fictitious documents. At that trial, Bennett was convicted on one count of obstruction of justice, two counts of conspiracy to obstruct justice and commit perjury, and four counts of perjury, see generally id. at 561; Bennett I at 2. The jury was not able to reach verdicts on other counts, and a second trial on those counts was held in May-June 1999. At the second trial--at which Bennett did not testify--the jury, although unable to reach verdicts on certain mail fraud and securities fraud counts, found Bennett guilty on two counts of securities fraud, five counts of bank fraud, five counts of engaging in monetary transactions with criminally derived property, and 30 counts of money laundering, see generally Bennett II, 252 F.3d at 561; Bennett I at 2. Following the second trial, Bennett was sentenced principally to 30 years' imprisonment and was ordered to forfeit $109,088,889.11.

In Bennett I, we affirmed Bennett's convictions, albeit not his sentence. We rejected all of Bennett's claims of trial error, including, as discussed in greater detail in Part II.B below, his contention that he was entitled to a new trial on the ground that the court at his second trial gave the jury erroneous or incomplete instructions with respect to mens rea on the fraud counts, see Bennett I at 5-6.

Simultaneously with our summary order in Bennett I, we filed a published opinion vacating Bennett's sentence and remanding to the district court for resentencing, ruling that the trial judge had departed upward from the Guidelines-recommended imprisonment range on an

impermissible basis.  See Bennett II, 252 F.3d at 564-65.  On remand, the court resentenced Bennett, imposing the same nonincarceratory penalties but imposing a prison term of 22 years rather than 30. This Court affirmed the new sentence.  See United States v. Bennett, No. 02-1379, 2003 U.S. App. LEXIS 19394 (2d Cir. Sept. 18, 2003) ("Bennett III") (summary order), cert. denied, 540 U.S. 1134 (2004).

B.　　　　Bennett's § 2255 Motion Claiming Ineffective Assistance of Counsel

At his first trial, Bennett had been represented by David Levitt and Mark Gombiner, attorneys from the Federal Defender Division of the Legal Aid Society ("Legal Aid"); at his second trial, he was represented by Gombiner and Legal Aid attorney Ian Yankwitt.  In 2003, represented by new counsel, Bennett filed a motion pursuant to 28 U.S.C. § 2255 (which was supplemented in 2004 to add a claim that is not pertinent to this appeal), seeking to vacate his sentence and conviction on the principal ground that he had received ineffective assistance of counsel at his second trial.

In support of his ineffective-assistance-of-counsel (or "IAC") claim, Bennett specified 19 instances in which he claimed his attorneys' performance had been deficient.  Items labeled Errors 1-11 alleged "errors and omissions relating to the jury instructions"; Errors 4-5 asserted that counsel failed to object to mens rea instructions that did not inform the jury that in order to find Bennett guilty on the bank fraud counts it must find an intent to harm the banks, and failed to object to the wording of an instruction on good faith as a defense.  Items labeled Errors 12-19 alleged "errors and omissions relating to trial conduct," including alleged failures to object to the indictment, to government evidence, or to government conduct, and failures to recognize and present effective defenses.  Number 17 asserted as follows:

Error 17.    Defense counsels [sic] performance improperly interfered with Movants [sic] constitutional right to testify at trial.

On the second day of trial, prior to any evidence being submitted against Movant, a discussion took place at a social luncheon between the district court, then U.S. Attorney for Southern District of New York, Mary Jo White, and head of Legal Aid Society, Leonard Joy concerning Movant's case. Based on the version of this discussion relayed to Movant by Mr. Joy, Movant became very upset and expressed his immediate concern to Mr. Joy and Mr. Gombiner, that Movant felt the district court was predisposed of his guilt. Neither Mr. Joy, Mr. Gombiner, nor anyone at Legal Aid Society, advised Movant, after expressing these concerns, of his legal right to immediately put this incident on the record to seek clarification from the district court; and, or ask for recusal. Movant's "fear" of the district court's predisposition of his guilt, became a primary reason Movant did not testify at the second trial. See Bennett affidavit. Ultimately, a recusal request was filed months after trial, for the balance of the proceedings, and the district court put on the record, January 28, 2000 hearing, pages 1-8, the contents of the above discussion. Movant[] has sworn that this was a materially different version from that told to him by Mr. Joy, and that if the district court's comments had been on the record immediately at trial, it would have clarified what took place, relieved Movant's concern, at the time, over the district courts [sic] predisposition. Movant's testimony was important to his defense, Movant has stated, if made aware of his rights by counsel, he would have immediately requested this incident been [sic] put on the record. Further, Mr. Gombiner was [sic] further interfered with Movants [sic] right to testify in erroneously advising Movants [sic] early in the trial, that Movant's first trial testimony could and would be entered into evidence and as a result spent no time preparing with Movant for his direct examining [sic], then informing Movant at the end of trial, he had been mistaken and all of Movant's First Trial Testimony could not be entered into the record.

Here, we have a "unique" set of circumstances. No speculation is needed as to how Movant would testify or its probable results. Movant had testified at his first trial. All second trial counts of conviction ended in jury deadlock and mis-trial.

(Bennett § 2255 Motion, Attachment A at 22-23 (emphasis added).)

The "Bennett affidavit" referred to in "Error 17" stated, inter alia, that Legal Aid attorney Joy told Bennett and Gombiner that at the luncheon in question, Judge John Martin, who was presiding over Bennett's second trial, suggested to Joy and the United States Attorney that Bennett's

- 6 -

case should be resolved by plea of guilty and that a 10-year sentence would be appropriate (see Affidavit of Patrick R. Bennett dated March 6, 2003 ("First Bennett Aff." or "First Affidavit"), ¶¶ 61-64). Bennett stated that "[b]ased on those events in paragraphs 61-64, I believed at the time that Judge Martin had a predisposition of my guilt. This haunted me throughout trial and greatly affected my decision not to testify at the second trial." (Id. ¶ 65; see also id. ¶ 70 ("my fear . . . of the Judge's pre-disposition of my guilt . . . weighed heavily in my decision not to testify at the second trial").)

In a detailed Memorandum Decision and Order dated March 22, 2006, Judge Crotty denied Bennett's § 2255 motion. See Bennett v. United States, No. 03 Civ. 1852(PAC), 2006 WL 738162 (S.D.N.Y. Mar. 22, 2006) ("Bennett IV"). Rejecting Bennett's claim in Error 17 "that trial counsel interfered with his right to testify by leading him to believe that the Court was predisposed to believe he was guilty and by failing to devote time to prepare him to testify," the court noted that "Bennett does not deny that he was aware of his right to testify" or claim that counsel advised him that he could not testify. Bennett IV at *14. The court found that counsel had--competently--recommended that he not testify:

> In view of the fact that Bennett had been found guilty of perjury and obstruction of justice, no competent lawyer would have recommended that he testify since he would have had to tell the jury that he had been convicted of these crimes. Moreover, even if counsel had been ineffective in this regard there is no reason to conclude that, if Bennett had testified, "the result of the proceeding would have been different." Strickland [v. Washington], 466 U.S. [668,] 698 [(1984)].

Bennett IV at *14. As to Bennett's contention with regard to the trial court's instructions on mens rea, the district court noted that those instructions had been challenged on Bennett's direct appeal and that this Court had found no basis for reversal. See id. at *11. Exploring all of the 19 alleged defects in counsel's performance, see id. at *9-*14, as well as their cumulative effect, see id. at *14-*15, the court concluded that, in light of the overwhelming evidence presented at trial, Bennett could not show that

the result of the trial would have been different but for the alleged errors, "either individually (as explained above) or in the aggregate," id. at *14.

C.  Bennett's Appeal from the Denial of His § 2255 Motion

The district court declined to grant Bennett a certificate of appealability (or "COA") to appeal its denial of his § 2255 motion. See Bennett IV at *16. Bennett thereafter applied to this Court for a COA with respect to 11 of the 19 IAC issues raised in his § 2255 motion. This Court, in an order dated January 12, 2007, granted a certificate limited to the two issues that Bennett had described as Errors 17 and 4-5, to wit,

> (1) whether defense counsel was ineffective for allegedly overriding [Bennett's] desire to exercise his constitutional right to testify in his own defense . . . ; and

> (2) whether [Bennett] was prejudiced by defense counsel's alleged failure to ensure the right to testify when the issue is analyzed in connection with counsel's failure to object to either the district court's omission of an intent to harm instruction, or the wording of the instruction on the 'good faith' defense, particularly in light of evidence of jury confusion as to intent . . . .

Following briefing and argument of the two certificated issues, this Court ordered a Jacobson remand to permit the district court to conduct an evidentiary hearing, including receiving testimony from Bennett's trial counsel, and to make findings with respect to those issues. See Bennett v. United States, No. 06-2443, 301 F. App'x 31 (2d Cir. Dec. 3, 2008) ("Bennett V"). We stated:

> We think it would be useful to us in deciding this appeal for the district court to determine, with the assistance of evidence, in affidavit form or otherwise, from the petitioner's trial counsel, and such other evidence as may be available and relevant, the circumstances under which counsel undertook the actions and omissions that the petitioner alleges overrode his desire to testify. More specifically, we hesitate to determine whether counsel's assistance was ineffective without first affording him "an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs." Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam).

Bennett V, 301 F. App'x at 32. Our order provided that, following those proceedings and findings, the appeal could be restored to this Court.

D. The Evidentiary Hearing on Remand

Prior to and during the hearing on remand, Bennett attempted to expand the proceedings beyond the two issues as to which this Court had granted the certificate of appealability--and indeed beyond the 11 issues as to which he had requested us to grant a COA and even beyond the 19 IAC issues raised in his § 2255 motion. See generally Bennett v. United States, No. 03 Civ. 1852(PAC), 97 cr. 639-1(PAC), 2009 WL 3614613, at *2 (S.D.N.Y. Nov. 3, 2009) ("Bennett VI"); id. at *1 n.2. For example, shortly after entry of our order in Bennett V, Bennett filed a supplemental affidavit alleging, for the first time, that

> [a]t no time did my court appointed attorneys or anyone else, advise me, or explain to me, that the ultimate decision to testify at trial was mine, and mine alone to make.

(Affidavit of Patrick R. Bennett dated December 18, 2008 ("Second Bennett Aff." or "Second Affidavit"), ¶ 3.) In May 2009, he moved to amend his § 2255 motion to assert, inter alia, this failure-to-advise claim, stating as follows:

> Bennett wishes to formally amend his Petition to include as a basis for his ineffective trial counsel claim that it was improper for his attorneys . . . to fail to inform him that it was his decision alone as to whether he could testify at trial . . . . Bennett also asks that he be permitted to prove that his trial attorneys' failure to advise him as to his right to testify constituted an independent ground unrelated to his ineffective assistance of counsel claim for which he is entitled to habeas relief.

(Petitioner's Memorandum of Law in Support of His Motion Pursuant to Rule 15 of the Federal Rule [sic] of Civil Procedure To Amend His Habeas Corpus Petition dated May 8, 2009, at 5.) Bennett

argued that the failure to advise him of his right to decide whether or not to testify both constituted an independent ground for relief and supported his claim that counsel's overall performance was ineffective. (See id. at 5-6.)

The district court denied Bennett's motion to amend his § 2255 motion--although it allowed evidence on, and eventually addressed, the new failure-to-advise claim as part of the certificated issue as to whether Bennett's desire to exercise his right to testify had been overridden. The court held a two-day hearing on June 8-9, 2009, at which it excluded most of the evidence proffered by Bennett that was not relevant to the two certificated issues. See generally Bennett VI at *2 & n.3. The principal witnesses at the hearing were Gombiner, Yankwitt, and Bennett.

## 1. The Hearing Testimony of Gombiner

Gombiner, a trial attorney with some two decades of experience by the late 1990s, testified that he was one of the Legal Aid attorneys representing Bennett in his criminal case from September or October 1998 through late June 1999. (Hearing Transcript ("Tr."), at 13-14, 17.) Gombiner testified that, while he did not have a specific recollection of advising Bennett of his right to decide whether or not to testify at the second trial, it was Gombiner's general practice, in any criminal case that might go to trial, "always [to] discuss with the client the fact that he has the right to testify," the "absolute right to testify." (Tr. 16.) Gombiner stated that he would often advise against the defendant's deciding to testify and would explain his reasons; "but I always tell them that they have the right to testify." (Id.)

> I always tell them that, look, this is one of the really few decisions that is up to you rather than up to me, the decision whether to plead guilty or to go to trial, that's your decision. And, the decision whether to testify or not, that's your decision. Most of the other decisions, . . . that's going to be my call.

(Id. at 17 (emphases added).)

Gombiner testified that he might not have such a conversation in a case in which it was clear that there was going to be a plea rather than a trial; "[b]ut, if we are preparing for a trial, we have it well before the trial starts because you need to determine before the trial begins, you at least have to have a sense as to whether or not you are going to put your client on the stand because that's going to dictate much of your other strategy." (Id. at 16.) Gombiner testified that before Bennett's second trial (see id. at 33), "I know we discussed the fact . . . that it was up to him" (id. at 32).

Gombiner doubted that he had had that discussion with Bennett with regard to the first trial because, when Gombiner joined Bennett's defense team, preparation for the first trial was underway and it had already been determined that Bennett would testify at that trial. (See Tr. 22-23, 49-50.) After the first trial, at which Bennett was convicted of the perjury and obstruction offenses described above, Levitt, who had led Bennett's defense at that trial, left the Legal Aid office and had no further involvement in Bennett's case. Gombiner became lead counsel and was joined by Yankwitt. There ensued discussions as to whether Bennett should enter into negotiations toward a plea bargain rather than going through a second trial. Gombiner testified that he and Yankwitt, knowing that convictions in securities fraud cases were common, thought that Bennett should take advantage of the "negotiating leverage" he had as a result of the jury's inability to achieve unanimity on the fraud counts at the first trial. Bennett, however, wanted to go to trial again, and the difference of opinion resulted in "some rather heated discussion." (Id. at 26.) It was decided that Bennett would go to trial again because Bennett wanted to, and "that was obviously his right." (Id.)

Once Bennett had decided to go to trial again, Gombiner advised him not to testify. Gombiner had interviewed the jurors after Bennett's first trial and learned that "they were 10 to 2 for conviction" and learned that "none of the jurors, including the two jurors who were holdouts for acquittal, none of them said that Mr. Bennett's testimony was a factor that operated in his favor"; rather,

- 11 -

"some just said, you know, the guy wasn't telling the truth." (Tr. 24-25.)

> My advice to Mr. Bennett was very strongly that he should not testify. I know I was basing that, one, on the results.
>
> You know, we had an experiment [sic] now. Generally you don't get to do that when you make this decision but we knew how at least [the] first jury had reacted to it.

(Id. at 29.) However, Gombiner also knew that

> of necessity [Bennett] pretty much had to testify the same way he had as the first trial. I mean, we couldn't come in there like with some other totally different explanations or, you know, as to what was going on. That would . . . obviously put you in a very poor position on cross-examination. . . . I was very concerned [about] the cross-examination . . . .

(Id. at 29-30.) Stating that he thought the government's cross-examination at the first trial had been "quite . . . poor" (id. at 30), Gombiner testified that he assumed the government "would do a better job" at the second trial "because they had all of Mr. Bennett's testimony" (id. at 60); he "thought the cross-examination at the second trial was likely to be more difficult to withstand" (id. at 30).

Gombiner also believed it would be disadvantageous to have to ask Bennett about his perjury at the first trial and for Bennett to offer the same peculiar, non-innocent, explanation for having given the SEC false statements and documents--which was that he committed and suborned perjury because he had done nothing wrong before but thought the SEC would not believe him:

> I also felt that we were in an almost impossible position . . . for Mr. Bennett [to] testify now that he had actually been convicted of perjury and obstruction of justice[.] I mean, I had two concerns about that. One is just the fact that--I would have had to elicit that on direct examination and although it was going to come into the trial anyway, I mean, it was putting Mr. Bennett himself on the stand and saying: Mr. Bennett, have you ever been convicted of a crime?
>
> And he would have to say: Perjury.
>
> In what case?
>
> This case.

I think that's a very poor start to any witness' [sic] testimony.

I was also concerned that, and I felt this at the first trial, too, that I thought his explanation for why he committed perjury and obstruction of justice, I'm not making any judgments about the veracity of it but the explanation essentially was: <u>I went before the SEC and I committed perjury and I helped--I falsified documents and I got other people to commit perjury and falsify documents and the reason that I did that was I had done absolutely nothing wrong but I didn't think the SEC was going to believe me if I told the truth because I didn't think they would believe that people did multi-million dollar transactions with so little paperwork or backup.</u>

I didn't think that was a good explanation. I didn't really want to get into that anymore than we had. I thought that would be a problem.

(Tr. 30-31 (italics in original); <u>see also id</u>. at 63 ("Bennett did not give an innocent explanation"; rather, "he admitted he did commit perjury and obstruction of justice").)

In response to the government's question as to whether Gombiner had made it clear to Bennett that, despite Gombiner's advice not to testify, it was ultimately Bennett's decision to make, Gombiner testified that he did

not have any specific recollection of any conversation where I sat down and said, Mr. Bennett, under the due process clause and under the compulsory process clause, etc., that you have a right to testify. I don't recall any discussion like that. I doubt if I gave any speech about it like that <u>but I know we discussed the fact</u> that he would have had--<u>that it was up to him</u>. I mean, I think that was actually implicit. He testified already so I wasn't really that--I don't think that was probably foremost in my mind but to the extent--<u>it would have been my practice to tell him that</u>. I'm sure he knew that already. Okay, I'm not sure he knew it because I'm not Mr. Bennett, but--

. . . .

. . . . That's best I can recollect about it.

Q: Mr. Gombiner, what was the determination with regard to whether or not Mr. Bennett would testify at the second trial?

A: Well, after he talked about it with me I know he talked about it with Mr. Yankwitt, <u>we determined that he wasn't going to testify</u>.

Q: <u>And who made that decision</u>?

A: Well, ultimately Mr. Bennett made that decision but it was--he certainly made it [with] my advice and Mr. Yankwitt's advice.

(Id. at 32-33 (emphases added).)

Gombiner testified that he had "hundreds" of discussions with Bennett (Tr. 34) and that, although discussions were "heated" as to whether Bennett should negotiate for a plea of guilty (id. at 26, 29, 34, 38, 48-49, 54), Gombiner did not recall, once Bennett decided to go to trial, that there were "any arguments with Mr. Bennett about whether or not he was going to testify" (id. at 38). Gombiner did not recall Bennett's ever disagreeing with counsel's recommendation not to testify or indicating any adamant desire to testify at the second trial. (See id. at 34.) Gombiner also testified that although he had some discussion with Bennett as to how much of Bennett's first-trial testimony would be read into evidence by the government, Gombiner never said that Bennett's entire testimony would be read into evidence at the second trial; nor, being familiar with the rules of evidence, would Gombiner ever have given such an opinion. (See id. at 39-40.) Gombiner also did not recall Bennett's ever either expressing a view that Judge Martin was biased or stating that his decision not to testify was influenced by such a view. (See id. at 38-39.) Gombiner did not prepare Bennett to testify because Bennett had decided not to testify. (See id. at 74.)

With respect to Bennett's contention that he received ineffective assistance of counsel by reason of failures to object to any aspect of the jury charge, Gombiner testified that if he did not object it was not for any tactical reason but was because he thought the instructions were not legally incorrect. (See id. at 89-90.)

2. The Hearing Testimony of Yankwitt

Yankwitt testified that he too, prior to the second trial (see, e.g., Tr. 103-04), had discussed with Bennett the right to testify and had "conveyed to him my view that testifying at his

- 14 -

second trial would be a really bad idea" because Yankwitt feared that "an effective cross would be devastating to any chance of an acquittal" (id. at 100-01). Yankwitt testified that, while making that recommendation, he "always made clear to clients that it was their decision" whether or not to testify (id. at 101). He did not have a "specific recollection of advising Mr. Bennett that the decision of whether to testify . . . was his and his alone" (id. at 111; see also id. at 101), but he testified that it was his "practice that [he] always said those things when [he] talked to a defendant about waiving significant rights" (id. at 101-02). Yankwitt testified that a day or two after his pretrial discussion with Bennett about testifying, Gombiner informed Yankwitt that Bennett had decided not to testify. (See id. at 103-04.) Yankwitt had no further discussions with Bennett as to whether Bennett would testify.

Yankwitt's reasons for viewing it as inadvisable for Bennett to testify at the second trial were largely the same as those expressed by Gombiner in his testimony, described in Part I.D.1. above. It was preferable for Bennett not to testify because

> at the first trial Pat had admitted to perjuring himself in a proceeding before the SEC and had explained that perjury in a way that could--in a way that could very well sound like he chose to lie because he believed that that would best serve his interests.

(Tr. 100.) And although the government could introduce evidence of Bennett's perjury and obstruction if Bennett did not testify, Yankwitt believed it would be less inflammatory for that evidence to come in through transcripts than through Bennett's live testimony. (See, e.g., id. at 100-01.) The court paraphrased:

> THE COURT: I think you said, Mr. Yankwitt, earlier, that it would be better for [Bennett's convictions for perjury and obstruction of justice resulting from the first trial] to come in without being hit over the head with it as he would have been had he testified to it and got on the stand.
>
> THE WITNESS: Yes.

(Id. at 113.)

- 15 -

3.  The Hearing Testimony of Bennett

Bennett's testimony at the June 2009 hearing differed substantially from that of Gombiner and Yankwitt. Bennett testified, inter alia, that neither attorney discussed the issue of his testifying with him before the second trial (see Tr. 174, 261-63), and that the first such discussion did not occur until "about a week into th[at] trial" (id. at 174; see also id. ("the second day of trial")). The discussion was held after Legal Aid attorney Joy--according to Bennett--told Bennett and Gombiner that Judge Martin at a luncheon had suggested that Bennett should plead guilty and receive a sentence of 10 years' imprisonment. (See id. at 175-76.) Bennett testified, consistent with the statements made in his First Affidavit, that this report made him fear that the judge had prejudged his case and made him fearful of testifying. (See id. at 175-76, 178-79.)

Bennett testified that he expressed this concern to Gombiner, and that Gombiner stated that an alternative to Bennett's testifying would be to introduce the transcript of his testimony from the first trial. Bennett testified that Gombiner told him the entire testimony could be introduced (see id. at 184-85, 273), and Bennett found that to be "an acceptable alternative [to testifying]. So I went along with that" (id. at 185). Bennett testified that it was not until this point, a week after the second trial had begun, that Yankwitt had any conversation whatever with him about testifying. Bennett testified that Yankwitt explained why he thought Bennett "shouldn't" testify; but, according to Bennett, "at that point I listened to him, but it was a moot point. In my mind I wasn't testifying now. My transcripts were coming in." (Id. at 185.)

Bennett testified that, about two days before the end of the second trial, Gombiner told him that "what [Gombiner had] said about putting in all the transcripts was wrong," and that the entire transcript of Bennett's first-trial testimony in fact could not be introduced. (Tr. 185-86.) Bennett responded to Gombiner that he therefore wanted to testify; but he testified at the hearing that he could

not testify because Gombiner told him

> well, there's no time to prepare, you know, we haven't spent any time going over anything, getting ready, you know, we just don't have time. And then he went into a long rant about his reason why he thought I shouldn't testify, which, you know, to me was just justifying the fact that he wasn't prepared to do my testimony.

(Id. at 186.)

Bennett testified that after the jury verdicts at the second trial, he was represented by new counsel and moved for Judge Martin's recusal; that motion was denied, as the judge stated that he had no "predisposition" as to Bennett's guilt or innocence, nor had he suggested a sentence (id. at 178; see id. at 177). Consistent with his assertion in his First Affidavit, Bennett testified at the hearing that, if he had known the court had no such predisposition, he would have testified at the second trial so that the court could hear his explanation of his conduct. (See id. at 178-79.)

Consistent with the alleged failure-to-advise claim introduced in his Second Affidavit, Bennett also testified that

> nobody ever from the Legal Aid office, ever, told me that I had a constitutional right to testify and that right was mine alone to make. No one ever said that to me, at any point in these proceedings, ever. I learned of that right doing law research at Otisville Law Library. If I had known of that, or if I had known of-- they never sat down and explained all the elements of the charges to me. No one ever even did that.

(Tr. 186-87.) He testified that neither Gombiner nor Yankwitt "at any time explain[ed] to [him] the parameters under which [he] could or could not testify." (Id. at 225.)

Bennett also testified that his decision not to testify would have been different if his attorneys had fully explained to him the charges against him (see id. at 187-88), had informed him of the elements of those charges (see id. at 192-93), had requested an instruction on "intent to harm for bank fraud where it is an essential element" (id. at 240), had not erroneously "requested an intent to harm instruction for securities fraud where it is not an element" (id.), had properly informed him of the

significance of the materiality element of the crime of securities fraud (see id. at 199), and had properly objected to the district court's instruction on his good-faith defense (see id. at 240-41).

E. The District Court's Findings

The district court, after summarizing the testimony given at the June 8-9 hearing, made findings with regard to, inter alia, the credibility of the witnesses, the substance and timing of advice given to Bennett by the Legal Aid attorneys, and the basis for Bennett's decision not to testify at his second trial. It found that Bennett's "statements about the legal advice he was given, when he was given such advice, and how he came to decide not to testify at his second trial are rejected as incredible." Bennett VI, 2009 WL 3614613, at *12.

The court discredited Bennett's testimony that his attorneys never advised him (a) that he had an absolute constitutional right to testify and (b) that the decision whether or not to exercise that right was his and his alone. Rather, "[t]he Court credit[ed] both Mr. Yankwitt's and Mr. Gombiner's testimony that, consistent with their practices, each advised Bennett of his right to testify" and that "[t]hese conversations took place before the second trial commenced." Id. at *11. The court found that "[i]n any factual dispute between Mr. Gombiner and Mr. Yankwitt on one side and Bennett on the other side, Bennett is not credible." Id. at *12.

The court also refused to credit Bennett's testimony that he was afraid to testify because he believed Judge Martin was "'predisposed' against him" or that Bennett "accepted his counsel's advice not to testify only because Mr. Gombiner assured him that the entire transcript of his testimony at the first trial would be used at the second trial." Id. at *10. The court found that, given Gombiner's testimony and his "skill, experience, intelligence and knowledge of the Federal Rules of Evidence," id.,

- 18 -

> Bennett's claim that Mr. Gombiner told him that the transcript of his testimony at the first trial would be received in evidence at the second trial is preposterous and is rejected,

id. at *11; see also id. at *12 ("Bennett's claim that his lawyers advised him that the entire transcript of his testimony from the first trial would be received in evidence is a fabrication."). The court also found not credible "Bennett's claim that he told Mr. Gombiner at the end of the Government's case that he wanted to testify." Id. at *11. The court stated that

> Bennett's testimony says more about his willingness to dissemble and distort in order to achieve his goal than it does about what happened prior to, and during his second trial. The same may be said of his so-called "fear" that Judge Martin was "predisposed" against him and that "predisposition" forced him to accept Mr. Gombiner's proposal to use the transcripts of the first trial rather than testifying again.

Id. at *10; see also id. at *12 ("The argument that [Bennett] was afraid of Judge Martin and therefore acquiesced in the supposed use of the transcript is . . . rejected."). The court concluded that "Bennett's argument that his counsel were ineffective because they overrode his desire to testify is rejected." Id. at *11. "As [Bennett] has in the past, he lied again." Id. at *12.

The district court also found that Bennett's right to testify at his second trial was not prejudiced by, inter alia, defense counsel's performance with respect to the trial court's mens rea instructions. It stated that the instructions in question had been found in Bennett I not to be erroneous and that it was therefore "hard to see how defense counsel's failure to object could have prejudiced Bennett." Id. at *4.

In light of its findings, the district court concluded that Bennett

> had effective defense counsel and they advised of his right to plead or to go to trial. Having opted for trial, they advised him of his right to testify or not testify. They encouraged him not to testify, and they had good reason for that advice. . . . Bennett knew he could not testify without exposing himself to substantial cross examination; his counsel advised him not to testify; he considered that advice and then he chose not to testify.

- 19 -

*Id.* at *12.

This Court was given notice of the district court's findings, and Bennett's appeal was restored to our calendar. Supplemental briefs were submitted by the government and by the attorneys who had represented Bennett at the June 2009 hearing. In mid-2010, those attorneys were allowed to withdraw and Bennett was permitted to proceed pro se. On March 30, 2011, Bennett was granted permission to file, pro se, an additional supplemental reply brief. We have considered all of the submissions.

## II. DISCUSSION

On appeal, Bennett contends principally that he is entitled to a new trial, arguing that the present record establishes that his attorneys (a) failed to inform him of his right to testify and his right to decide whether or not to testify, and (b) overrode, through errors and omissions in their preparation for and conduct of the trial, his desire to testify. In addition, in both his posthearing counseled supplemental briefs and his posthearing pro se supplemental reply brief, Bennett requests that the certificate of appealability be expanded to encompass other alleged errors.

Bennett's current request for an expansion of the certificate of appealability is his third such motion in this Court. The first two motions were denied in orders dated April 14, 2010, and September 2, 2010. His present request is likewise denied, as his submissions fail to "ma[k]e a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2).

As to the issues covered by the COA that was granted, we reject Bennett's contentions for the reasons that follow.

A.  Bennett's Right To Testify and To Decide Whether To Testify

With respect to the first issue as to which we granted a certificate of appealability, i.e., whether defense counsel rendered constitutionally ineffective assistance by overriding Bennett's desire to exercise his constitutional right to testify at his second trial, we begin by considering, as did the district court on the Jacobson remand, the related issue of whether Bennett was advised of his constitutional rights to testify at trial and to be the sole decider of whether or not to testify.  Bennett argues, inter alia, that because he testified at the hearing that he was not so advised and because neither Gombiner nor Yankwitt remembered a specific conversation in which Bennett was so advised, the district court's finding that he was in fact so advised should be overturned.  Under the standards established by Strickland v. Washington, 466 U.S. 668 (1984), for consideration of claims of ineffective assistance of counsel, we reject his argument and this facet of his IAC claim.

"At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  Rock v. Arkansas, 483 U.S. 44, 49 (1987); see, e.g., Harris v. New York, 401 U.S. 222, 225 (1971).  This right, which "is one of the rights that 'are essential to due process of law in a fair adversary process,'" Rock, 483 U.S. at 51 (quoting Faretta v. California, 422 U.S. 806, 819 n.15 (1975)), has its roots in several provisions of the Constitution, including the Due Process Clause of the Fifth Amendment, the Fifth Amendment's guarantee against compelled testimony, and the Compulsory Process Clause of the Sixth Amendment, see, e.g., Rock, 483 U.S. at 51-52.

Our Court's framework for consideration of a claim that a defendant has been denied the right to testify at his criminal trial was established in Brown v. Artuz, 124 F.3d 73 (2d Cir. 1997).  In Brown, we held that "the decision whether to testify belongs to the defendant and may not be made for him by defense counsel," id. at 78, and that defense counsel has a duty to inform the defendant of

that right, see id. at 79.

> [D]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify . . . .  Although counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter.

Id. (internal quotation marks omitted) (emphasis ours).  Moreover,

> [b]ecause the burden of ensuring that the defendant is informed of the nature and existence of the right to testify rests upon defense counsel, we conclude that this burden is a component of the effective assistance of counsel. As a result, any claim by the defendant that defense counsel has not discharged this responsibility--either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify--must satisfy the two-prong test established in Strickland v. Washington, 466 U.S. 668 . . . (1984), for assessing whether counsel has rendered constitutionally ineffective assistance. . . .

Brown, 124 F.3d at 79.

Under Strickland, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test:  (1) he "must show that counsel's performance was deficient," 466 U.S. at 687, so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," id. at 690; and (2) he must show "that the deficient performance prejudiced the defense," id. at 687, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

The Strickland standard is "highly demanding," Kimmelman v. Morrison, 477 U.S. 365, 382 (1986), and "rigorous," Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).  The IAC claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong.  See, e.g., Strickland, 466 U.S. at 687, 697; Chang v. United States, 250 F.3d 79, 84 (2d Cir. 2001) (given that

Chang did "not establish[] a deficiency in representation," "we . . . need not address the prejudice issue"); Brown, 124 F.3d at 80 (seeing no need to remand for findings as to counsel's performance, given that "Brown cannot satisfy the prejudice prong of the Strickland test"). See also Chang, 250 F.3d at 84 (upholding ruling that the performance prong was not established where the only evidence that the defendant was prevented from testifying came from "his own blanket statements" (internal quotation marks omitted)).

The ultimate question of counsel's "[i]neffectiveness is not a question of basic, primary, or historical fac[t]," Strickland, 466 U.S. at 698 (internal quotation marks omitted), but rather is a mixed question of law and fact. "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," id.--and we review a district court's conclusions on those issues de novo, see, e.g., Chang, 250 F.3d at 82--"although district court findings" as to basic, primary, or historical fact "are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a)," Strickland, 466 U.S. at 698.

Rule 52(a) provides that the district court's "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). Construing a substantively identical prior version of that Rule, the Supreme Court has noted that a

> reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.

Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (internal quotation marks omitted). Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574.

"Issues involving credibility are normally considered factual matters," Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402 (1990), and Rule 52(a) "emphasize[s] the special deference to be paid credibility determinations," Anderson v. Bessemer City, 470 U.S. at 574. This deference reflects "the superiority of the trial judge's position to make determinations of credibility," id., since "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said," id. at 575. Thus,

> when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

Id.

In the present case, applying these standards to the district court's posthearing findings of historical fact--especially with regard to the questions of who said what to whom--we conclude that on the claims that counsel failed to advise him with respect to his right to testify and/or overrode his desire to testify, Bennett has not met the performance prong of the Strickland test. His claim that neither Gombiner nor Yankwitt, nor anyone else at Legal Aid, informed him of his rights to testify and to decide whether to testify is unsupported by any evidence other than Bennett's blanket assertion that he was not so informed. Although Bennett complains that the district court at the hearing excluded evidence that would have corroborated his testimony, the exclusion was plainly correct, given that what was proffered would either have been testimony by other persons as to what was in Bennett's mind or hearsay testimony as to what Bennett had told them. Bennett himself was of course entitled to, and did, give his own version of what his attorneys had or had not said to him. His version, much of which the court found implausible--indeed, "preposterous," Bennett VI, 2009 WL 3614613, at *10, *11--was contradicted by the testimony of both Gombiner and Yankwitt. The fact that at the hearing neither attorney could remember the particular conversation in which he advised Bennett of his rights to testify

- 24 -

and to decide whether to do so is hardly surprising, given that there were "hundreds" of conversations with Bennett (Tr. 34) and that the hearing was held 10 years after Bennett's second trial. Cf. Greiner v. Wells, 417 F.3d 305, 326 (2d Cir. 2005) ("Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the Strickland presumption of effective performance."). Both Gombiner and Yankwitt testified to their respective practices "always" to inform a client who was going to trial that it was the client's absolute right to testify and to decide whether to testify. (E.g, Tr. 16, 17, 101.) And as to his conversations with Bennett in particular, Gombiner testified, "I know we discussed the fact . . . that it was up to him." (Id. at 32). The district court, who observed these three witnesses, was entitled to find that the testimony of Gombiner and Yankwitt was to be credited and that the testimony of Bennett was not.

The court's finding that Bennett was in fact informed by his attorneys of his rights with respect to testifying at his second trial also finds support in assertions made--and not made--by Bennett himself over the course of this proceeding. To begin with, although Bennett's § 2255 motion based on the alleged ineffective assistance of counsel, made in March 2003 (and supplemented in 2004 with an unrelated claim), asserted that counsel had made 19 errors--involving such matters as venue, the admissibility of coconspirator testimony, the sufficiency of the evidence to convict Bennett on certain counts, various instructions to the jury, and alleged statements causing Bennett to perceive a bias on the part of the trial judge--there was no semblance in that motion of any allegation that Bennett had not been advised by his attorneys of his constitutional right to testify or of the right to make his own decision as to whether to testify. It was not until December 2008, nearly six years after his § 2255 motion claiming that counsel had erred in 19 ways, and more than nine years after his second trial, that Bennett first raised a failure-to-advise claim.

Moreover, both prior to and since his assertion of a failure-to-advise claim, Bennett has made statements that indicate he knew he had the rights to testify and to decide whether to testify at his second trial. For example, in his First Affidavit, submitted in March 2003 in support of his § 2255 motion, Bennett, in asserting his belief that the trial judge had been predisposed against him, stated that that belief "haunted me throughout trial and greatly affected **my** decision not to testify at the second trial" (First Bennett Aff. ¶ 65 (emphasis added)) and "weighed heavily in **my** decision not to testify at the second trial" (id. ¶ 70 (emphasis added)). Thus, the district court noted that "Bennett's affidavit in support of the 2255 petition makes it clear . . . that he had a choice, and he made the choice to not testify at the second trial." Bennett VI, 2009 WL 3614613, at *7. Further, the implication in those early statements that Bennett knew the choice was his was reinforced by some of his assertions at the June 2009 hearing. For example, in claiming that counsel's performance was deficient in various other ways, Bennett testified that "if I was aware of the proper charges, . . . I would have testified" (Tr. 192 (emphasis added)); that "if my first transcript came in, if--none of it would have mattered, I would have testified no matter what" (id. (emphasis added)); that "[i]f I had been properly informed of [the significance of materiality with respect to the charged offenses], I would have testified under any set of conditions" (id. at 199 (emphasis added)).

Given Bennett's statements and the record as a whole, we conclude that the district court's finding that Bennett had been informed that he had the absolute right to testify and to decide whether or not to testify cannot be considered error, much less "clear[] erro[r]."

Nor do we see any basis for overturning the district court's ruling that Bennett's alleged "desire" to testify was "overridden" by counsel. Gombiner testified that although there had been heated discussions as to whether to go to trial, after Bennett made the decision to go to trial there were no

arguments over whether Bennett should testify. Both Gombiner and Yankwitt testified that Bennett, prior to the second trial, made the decision not to testify, and Gombiner recalled no instance in which Bennett indicated any strong desire to testify. (See id. at 32-34, 38, 103-04.) The court found incredible Bennett's testimony that he wanted to testify but declined to do so because he feared the trial judge was predisposed against him, and found incredible Bennett's testimony that Gombiner assured him that he need not testify because his first-trial testimony would be admitted at the second trial. Gombiner denied that he had made any such statement to Bennett, a denial that was entirely credible in light of the rules of evidence and Gombiner's decades of experience at the time of that alleged conversation. In finding that "Gombiner did not give such advice," Bennett VI, 2009 WL 3614613, at *10, the court credited the testimony of Gombiner, as it was entitled to, and found that Bennett's contradictory testimony at the hearing was untruthful. Our review of the record persuades us that these findings are not clearly erroneous.

In light of the court's substantiated factual and credibility findings, we see no error in its conclusion that there was no deficient performance by counsel with respect to the failure-to-advise aspect of Bennett's IAC claim or his claim that his attorneys overrode his desire to testify.

B. Whether Counsel's Failure To Object to the Mens Rea Instructions Prejudiced Bennett's Right To Testify

The second issue on which Bennett was granted a certificate of appealability does not require extended discussion. That question asks whether, particularly in light of evidence of jury confusion, Bennett's right to testify was prejudiced when the issue is analyzed in connection with the lack of objection by counsel to the district court's instructions on mens rea. We conclude that this question must be answered in the negative because Bennett cannot meet the prejudice prong of the

Strickland test, i.e., show a reasonable probability that, had there been objections, the outcome on any count would have been different.

First, although Bennett attempted to testify at the hearing that he wanted to testify at the second trial because of a note sent to the court by the jury "during jury deliberations" (Tr. 202), the district court properly ruled that, as the evidence was closed prior to the submission of the case to the jury, an inquiry by the jury during its deliberations could not have affected Bennett's right to testify (see id.; id. at 221-24). Similarly, Bennett does not explain how his right to testify could have been affected by a failure to object to any aspect of the jury charge, given that by the time there were proposed instructions to which objection could be made, the defense had rested and the evidence was closed (see, e.g., Tr. 36).

Second, in order to show prejudice of the magnitude needed to support a claim of ineffective assistance of counsel, Bennett is required to show a reasonable probability that but for the failures to object, the jury would not have convicted him on some count on which it found him guilty. He has made no such showing. Moreover, the two aspects of the jury charge covered by this certified question, i.e., the unobjected-to instructions on mens rea, were, on Bennett's first appeal, expressly reviewed under the plain-error standard, see Bennett I, at 3. In order to meet that standard, an error, even if clear or obvious, must "'affec[t] substantial rights,'" which normally "means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993) (quoting Fed. R. Crim. P. 52(b)) (emphasis added); see, e.g., United States v. Marcus, 130 S. Ct. 2159, 2164 (2010) (whether "the error 'affected the appellant's substantial rights, . . . in the ordinary case[,] means' [whether] it 'affected the outcome of the district court proceedings'") (quoting Puckett v. United States, 129 S.Ct. 1423, 1429 (2009)).

- 28 -

In Bennett I, we found that the unobjected-to instruction that did not tell the jury it could not convict Bennett of bank fraud without finding that he intended to harm the banks was not such an error. We pointed out, citing United States v. Chandler, 98 F.3d 711, 716 (2d Cir. 1996), that "where the borrower has knowingly misstated his ability to pay back a loan, a trial judge does not plainly err by omitting an intent to harm instruction from a bank fraud charge." Bennett I, at 4. Having noted that Bennett had "borrow[ed] from investors and banks using inflated income statements" and had "attempt[ed] to hide cash by transferring it into unaudited accounts," Bennett I, at 2, we concluded that the absence of an intent-to-harm instruction was not an error that affected Bennett's substantial rights, id. at 4.

Similarly, as to the trial court's instruction that Bennett's testimony that he had believed "everything would work out" was not sufficient to establish a defense of good faith, Bennett I, at 5, we noted, citing United States v. Berkovich, 168 F.3d 64, 67 (2d Cir. 1999), that such an "instruction is not plainly erroneous where, as here, the evidence indicates that the defendant might have hoped only for ultimate gains that would mask the immediate loss or risk of immediate loss created by his misrepresentations." Bennett I, at 5 (emphases added).

In sum, we reviewed these unobjected-to mens rea instructions, which are the subject of the second COA question, "for plain error affecting substantial rights," Bennett I, at 3, which, as discussed above, normally means that the error must have "affected the outcome of the district court proceedings," e.g., Olano, 507 U.S. at 734, and we concluded that Bennett failed to meet that standard, see id. at 4-5. Accordingly, we see no basis on the present appeal for concluding, as to any count, that there is any reasonable probability that, had there been objections, the jury would not have found Bennett guilty. Thus, Bennett cannot show that the failures to object satisfy the prejudice prong of the Strickland test, and this facet of his ineffective-assistance-of-counsel claim too was properly rejected.

CONCLUSION

We have considered all of Bennett's arguments on this appeal and have found them to be without merit.  The judgment of the district court denying Bennett's § 2255 motion is affirmed.